**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION**

LINNEY'S PIZZA, LLC,

               *Plaintiff,*

v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

               *Defendant.*

Civil Action No. 3:22-CV-71-GFVT

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF LINNEY'S PIZZA, LLC'S COMBINED RESPONSE IN OPPOSITION TO
DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................................ii

Introduction ...............................................................................................................................1

Argument ....................................................................................................................................2

I.    Regulation II is contrary to law ........................................................................................2

    A.    The Board gets no deference in interpreting what the Durbin Amendment means...........2

    B.    The Board's arguments for creating the third category of costs are erroneous. ..................6

    C.    The Board's arguments for including the prohibited costs in the fee standard are erroneous....................................................................................................................12

    D.    The Board's arguments for setting a one-size-fits-all fee standard are erroneous............18

II.    Regulation II is arbitrary and capricious. ........................................................................22

    A.    The Board cannot justify its failure to consider the functional similarities between debit and checking transactions.......................................................................................22

    B.    The Board cannot rebut Linney's Pizza's arguments that the Board failed to define "incremental costs" and improper inclusion of prohibited costs.........................................24

    C.    The Board fails to rebut Linney's Pizza's argument that the Board improperly rejected an issuer-specific and transaction-specific fee standard.........................................25

III.    Vacatur with a stay is the appropriate remedy. ................................................................25

Conclusion ................................................................................................................................27

Certificate of Service ................................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Air Transport Ass'n of Am., Inc. v. USDA*,
  2021 WL 1166928  (D.D.C. Mar. 26) ............................................................................................5

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2012) .......................................................................................................................11

*Ala. Med. Ctr. v. Sebelius*,
  572 F.3d 912 (D.C. Cir. 2009) .......................................................................................................5

*All. for Fair Bd. Recruitment v. SEC*,
  125 F.4th 159 (5th Cir. 2024) .................................................................................................7, 12

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .........................................................................................................................7

*Autotrol Corp. v. Cont'l Water Sys. Corp.*,
  918 F.2d 689 (7th Cir. 1990) .........................................................................................................12

*Batterton v. Francis*,
  432 U.S. 416 (1977)..........................................................................................................................3

*Biden v. Missouri*,
  595 U.S. 87 (2022)............................................................................................................................5

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)..........................................................................................................................7

*Bridgeport Hosp. v. Becerra*,
  108 F.4th 882 (D.C. Cir. 2024) ....................................................................................................26

*Brown v. Gardner*,
  513 U.S. 115 (1994)..........................................................................................................................5

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) .................................................................................................5, 22

*Chamber of Com. of U.S. v. SEC*,
  88 F.4th 1115 (5th Cir. 2023).......................................................................................................27

*Chapman v. Higbee Co.*,
  319 F.3d 825 (6th Cir. 2003) ........................................................................................................20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..........................................................................................................................1

*Cleveland-Cliffs Iron Co. v. ICC,*
    664 F.2d 568 (6th Cir. 1981) ............................................................................ 4

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) ................................................................ 13, 19, 26

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) .......................................................................................... 11

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ..................................................................................... 5, 26

*Dalombo Fontes v. Gonzales,*
    498 F.3d 1 (1st Cir. 2007) .................................................................................. 6

*Demchak Partners Ltd. P'ship v. Chesapeake Appalachia, LLC,*
    2014 WL 4955259 (M.D. Pa. Sept. 30, 2014) .................................................. 6

*DHS v. Regents of Univ. of Cal.,*
    591 U.S. 1 (2020) ...................................................................................... 25, 26

*FCC v. Prometheus Radio Proj.,*
    592 U.S. 414 (2021) .......................................................................................... 22

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .......................................................................................... 10

*Georgetown U. Hosp. v. Sullivan,*
    934 F.2d 1280 (D.C. Cir. 1991) ....................................................................... 19

*Georgia v. President of the United States,*
    46 F.4th 1283 (11th Cir. 2022) ......................................................................... 5

*Getty v. Fed. Savs. & Loan Ins. Corp.,*
    805 F.2d 1050 (D.C. Cir. 1986) ....................................................................... 23

*In re MCP No. 185,*
    124 F.4th 993 (6th Cir. 2025) ............................................................... 2, 4, 5, 26

*In re Simply Essentials, LLC,*
    78 F.4th 1006 (8th Cir. 2023) .......................................................................... 11

*Jaskolski v. Daniels,*
    427 F.3d 456 (7th Cir. 2005) ........................................................................... 20

*Kaweah Delta Health Care Dist. v. Becerra,*
    123 F.4th 939 (9th Cir. 2024) .......................................................................... 27

*Kentucky v. EPA,*
    123 F.4th 447 (6th Cir. 2024) ................................................................. 2, 4, 26

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ...................................................................................................22

*LifePoint Corp. Servs. Gen. P'ship v. WellCare Health Ins. Co. of Ky.,*
2023 WL 2388551 (E.D. Ky. Mar. 7, 2023) ...........................................................20

*Lockhart v. United States,*
577 U.S. 347 (2016) ...............................................................................................10

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................................................1, 2, 3, 4, 5

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ...............................................................................................11

*Louisiana v. Dep't of Energy,*
90 F.4th 461 (5th Cir. 2024) ..................................................................................23

*Luna Torres v. Lynch,*
578 U.S. 452 (2016) .................................................................................................8

*Marin Audubon Soc'y v. FAA,*
121 F.4th 902 (D.C. Cir. 2024) ..............................................................................27

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013) ...............................................................................................11

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.,*
851 F.3d 1076 (11th Cir. 2017) ...............................................................................9

*Michigan v. EPA,*
576 U.S. 743 (2015) ...........................................................................................3, 24

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ...............................................................................26

*Moctezuma-Reyes v. Garland,*
124 F.4th 416 (6th Cir. 2024) ..................................................................................2

*Motor Veh. Mfrs. Ass'n v. State Farm Ins. Co.,*
463 U.S. 29 (1983) .................................................................................................22

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
746 F.3d 474 (D.C. Circ. 2014) .........................................................1, 7, 13, 14, 17

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
958 F. Supp. 2d 85 (D.D.C. 2013) .......................................................7, 8, 9, 11, 15

*Nat'l Ass'n of Mfrs. v. DOD,*
583 U.S. 109 (2018) ...............................................................................................18

*NLRB v. Noel Canning,*
 573 U.S. 513 (2014)...................................................................................................... 18, 19

*NRDC v. EPA,*
 489 F.3d 1250 (D.C. Cir. 2007)..........................................................................................27

*Oncale v. Sundowner Offshore Servs., Inc.,*
 523 U.S. 75 (1998)..............................................................................................................17

*Pearson v. Shalala,*
 164 F.3d 650 (D.C. Cir. 1999)............................................................................................24

*Pereira v. Sessions,*
 585 U.S. 198 (2018)...................................................................................................... 13, 19

*Pub. Serv. Co. of Ind. v. ICC,*
 749 F.2d 753 (D.C. Cir. 1984)............................................................................................22

*Pulsifer v. United States,*
 601 U.S. 124 (2024)........................................................................................................ 8, 19

*Quito-Guachichulca v. Garland,*
 122 F.4th 732 (8th Cir. 2024) ...............................................................................................5

*Qwest Corp. v. FCC,*
 258 F.3d 1191 (10th Cir. 2001) ..........................................................................................24

*Rhodes v. County of Darlington,*
 833 F. Supp. 1163 (D.S.C. 1992) ..........................................................................................9

*Rimini St., Inc. v. Oracle USA, Inc.,*
 586 U.S. 334 (2019)............................................................................................................11

*San Antonio v. United States,*
 631 F.2d 831 (D.C. Cir. 1980)............................................................................................12

*Sevier v. Lowenthal,*
 302 F. Supp. 3d 312 (D.D.C. 2018)......................................................................................6

*Sierra Club v. EPA,*
 60 F.4th 1008 (6th Cir. 2023) .............................................................................................26

*Sierra Club v. EPA,*
 964 F.3d 882 (10th Cir. 2020) ..............................................................................................6

*Sierra Club v. U.S. Forest Serv.,*
 828 F.3d 402 (6th Cir. 2016) ........................................................................................ 24, 25

*Sw. Elec. Power Co. v. EPA,*
 920 F.3d 999 (5th Cir. 2019) ..............................................................................................22

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
　566 U.S. 560 (2012) ................................................................................................... 15

*Tennessee v. Becerra,*
　131 F.4th 350 (6th Cir. 2025) ...................................................................................... 2

*Tennessee v. Cardona,*
　--- F. Supp. 3d ---, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025) ................................... 26

*Tex. Brine Co., LLC v. Am. Arb. Ass'n,*
　955 F.3d 482 (5th Cir. 2020) ...................................................................................... 20

*Tex. Med. Ass'n v. HHS,*
　110 F.4th 762 (5th Cir. 2024) ......................................................................... 4, 22, 24

*Thomas v. Reeves,*
　961 F.3d 800 (5th Cir. 2020) ...................................................................................... 20

*Trs. of Nat'l Ret. Fund v. Fireservice Mgmt. LLC,*
　384 F. Supp. 3d 412 (S.D.N.Y. 2019) .......................................................................... 6

*U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.,*
　508 U.S. 439 (1993) .................................................................................................... 10

*United States v. Boulding,*
　960 F.3d 774 (6th Cir. 2020) ...................................................................................... 10

*United States v. Indoor Cultivation Equip.,*
　55 F.3d 1311 (7th Cir. 1995) ........................................................................................ 9

*United States v. Knight,*
　2023 WL 5338637 (6th Cir. Aug. 18, 2023) .............................................................. 11

*United States v. Sineneng-Smith,*
　590 U.S. 371 (2020) ...................................................................................................... 6

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
　570 U.S. 338 (2013) .................................................................................................... 16

*Util. Air Regul. Grp. v. EPA,*
　573 U.S. 302 (2014) .................................................................................................... 11

*Van Loon v. Dep't of Treasury,*
　122 F.4th 549 (5th Cir. 2024) ...................................................................................... 2

*Voss v. Comm'r of Internal Revenue,*
　796 F.3d 1051 (9th Cir. 2015) ...................................................................................... 5

*W. Minn. Mun. Power Agency v. FERC,*
　806 F.3d 588 (D.C. Cir. 2015) .................................................................................... 20

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................................................................. 11

## Statutes

15 U.S.C. §1693b ........................................................................................................................... 9

15 U.S.C. §1693*o*-2 ......................... 8, 9, 11, 12, 13, 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29, 30

5 U.S.C. §706 ................................................................................................................... 6, 9, 27, 31

## Other Authorities

156 Cong. Rec. S5914 (daily ed. July 15, 2010) (Statement of Sen. Reed) ............................................. 25

156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin) ................................... 12, 25

Antonin Scalia & Bryan Garner, *Reading Law* (2012) .......................................... 10, 15, 24, 25

Federal Reserve, 2021 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and
    Merchant Fraud Losses Related to Debit Card Transactions (Oct. 2023) ........................................ 26

## Regulations

Regulation II, 76 Fed. Reg. 43,394 (July 20, 2011) ............................................... 18, 19, 20, 26, 28, 29, 30

Updated Rule, 80 Fed. Reg. 48,684 (Aug. 14, 2015) ................................................................................ 19

## INTRODUCTION

Federal agencies like the Board have relied on *Chevron* deference for decades to defend their dubious interpretations of their congressional mandates. And *Chevron* deference was the reason the Board prevailed the last time Regulation II was challenged. *See NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 483-89 (D.C. Cir. 2014) ("*NACS II*"). In essence, *Chevron* deference gave agencies discretion to fill purported ambiguities in statutes as long as the agencies' doing so was "a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984). But the Supreme Court ended that practice last year when it overruled *Chevron. See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Now, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412.

The Board apparently didn't get the message. The very *first* argument the Board makes here is a plea for deference; it urges this Court to uphold Regulation II's fee standard as a matter of deference to agency discretion. But that mode of analysis is simply *Chevron* deference by a different name, and it is precluded by the Supreme Court's decision in *Loper Bright*. The Board gets no deference in interpreting what the Durbin Amendment says and means. The Board resorts to a defunct deference regime only because it has no persuasive argument on the merits—its arguments largely elide the Durbin Amendment's text, context, structure, and purpose and focus instead on isolated words and punctuation, while invoking inapplicable interpretative canons. In the absence of the deference that sustained Regulation II in *NACS II*, Regulation II must fall.

The amicus curiae briefs submitted by the proposed intervenors and the American Bankers Association try to make this case about something other than statutory text. They describe it as pitting the big retailers against the big banks. But this case is about Linney's Pizza's injuries. *See* Linney Decl. (Doc. 39-8) ¶¶5-6. And it is about whether the Board adhered to Congress's directives. The APA gives every plaintiff—every small business like Linney's Pizza—the right to seek this Court's review. And the APA requires this Court to "hold unlawful and set aside" Regulation II's fee standard because it

is contrary to law and because it is arbitrary and capricious. 5 U.S.C. §706(2). The Court should grant Linney's Pizza's motion for summary judgment and deny the Board's cross-motion.

## ARGUMENT

### I.    Regulation II is contrary to law.

#### A.    The Board gets no deference in interpreting what the Durbin Amendment means.

The Board first says that it's entitled to "deferential review." Board-Br. 12. But judicial deference to administrative agencies in statutory interpretation is now gone. *Loper Bright*, 603 U.S. at 411-12. "*Chevron* deference has fallen." *Tennessee v. Becerra*, 131 F.4th 350, 365 (6th Cir. 2025). The APA "makes clear that agency interpretations of statutes … are *not* entitled to deference." *Loper Bright*, 603 U.S. at 371. So now, to determine "whether an agency has acted within its statutory authority," as the APA requires, this Court "must exercise [its] independent judgment." *In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 412).

The Board is not the first agency to respond to the post-*Chevron* world by claiming that it should still receive the same amount of deference from courts, even after *Loper Bright*. But "[t]he case that declared '*Chevron* is overruled' didn't quietly reinstitute it." *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 412). As the Sixth Circuit explained when rejecting this exact line of argument, courts "should no longer defer to an agency's answers to legal questions." *Kentucky v. EPA*, 123 F.4th 447, 467 (6th Cir. 2024). The Board "resolves a pure question of law when it interprets key terms" in §1693*o*-2 (such as "incremental cost," "other costs," "specific to," and "particular electronic debit transaction"). *Id.* So when it comes to interpretation of these purely legal statutory terms, there can be no "deferential standard"—the Court "must review (and correct) the agency's mistaken interpretation of those terms *without giving it deference*." *Id.* (emphasis added). The APA requires this Court to "determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Van Loon v. Dep't of Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) (cleaned up). And it must "use every tool at [its] disposal to determine the best reading of the statute." *In re MCP*, 124 F.4th at 1002 (quoting *Loper Bright*, 603 U.S. at 400).

The Board responds to that new reality by trying to repackage *Chevron* deference under a different rubric. It says that Regulation II should receive deferential review on its interpretation of statutory terms because the Durbin Amendment elsewhere "broadly delegates … discretion" to the Board in setting the fee standard. Board-Br. 11. In support, the Board points (at 12-13) to the Durbin Amendment's language directing the Board to "prescribe regulations … regarding any interchange transaction fee." 15 U.S.C. §1693*o*-2(a)(1). The Board also relies on the Durbin Amendment's direction that the Board should "establish *standards* for assessing whether the amount of any interchange transaction fee … is *reasonable* and *proportional* to the cost incurred by the issuer." *Id.* §1693*o*-2(a)(3)(A) (emphasis added).

If that is all the Durbin Amendment said, the Board might have a point. Some statutes broadly tell agencies to exercise their discretion in defining a statutory term or setting a "reasonable" rate without identifying any statutory guardrails. *See, e.g., Batterton v. Francis*, 432 U.S. 416, 425-26 (1977); Board-Br. 12-14. In such instances, a court has no statutory interpretive work to do: The statute itself gives the agency a "degree of discretion" to make a policy decision, *Loper Bright*, 603 U.S. at 394, and the role of the court in those instances is merely to determine whether the agency's policy choice followed a path of "reasoned decisionmaking," *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

But that is not what the Durbin Amendment does. To the contrary, the Durbin Amendment specifically tells the Board *how to calculate* a "reasonable" and "proportional" interchange transaction fee. In particular, Congress instructed the Board to "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, *which cost shall be considered*" and (ii) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, *which costs shall not be considered.*" 15 U.S.C. §1693*o*-2(a)(4)(B) (emphasis added). Congress also told the Board to "consider the functional similarity between (i) electronic debit transactions; and (ii) checking transactions that are required … to clear at par." *Id.* §1693*o*-2(a)(4)(A). Furthermore, Congress prohibited the use of network fees to compensate an issuer. *Id.* §1693*o*-2(a)(8). And Congress required that issuers receive adjustments to interchange fees only after implementing the Board's regulations relating to fraud

prevention. *Id.* §1693*o*-2(a)(5). Congress gave the Board numerous statutory instructions for how to determine an appropriate interchange transaction fee, and in litigation over whether the Board followed those instructions, this Court may not defer to the Board's interpretation of those instructions. The meaning of those instructions is for this Court to decide through its own "independent judgment." *Loper Bright*, 603 U.S. at 412.

Indeed, even the Board concedes (at 13) that under its "discretion" theory an agency cannot receive deference with respect to its consideration of certain factors where the statute itself "barred [the agency] from considering these factors." Yet *that's precisely what the Durbin Amendment does*. It permits the Board to "consider[ ]" the "incremental cost incurred by an issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," while expressly providing that "other costs incurred by an issuer … *shall not be considered*." 15 U.S.C. §1693*o*-2(a)(4)(B) (emphasis added). Even on the Board's view, then, it receives no deference when this Court is called to decide whether the Board considered prohibited costs under the Durbin Amendment and thereby "stray[ed]" "beyond" the "outer statutory boundary" that "Congress created." *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 776 (5th Cir. 2024) (citing *Loper Bright*, 603 U.S. at 404); *cf. Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568, 580 (6th Cir. 1981) (the court "retain[s] authority … to determine whether [agency] decisions comport with applicable law"). Whether the Board strayed beyond that boundary is a question of law for which the Board receives no deference after *Loper Bright*. *See, e.g.*, *Kentucky*, 123 F.4th at 467; *In re MCP*, 124 F.4th at 1012.

Next, the Board also asserts that the Dodd-Frank Act itself calls for deferential review. Board-Br. 14. This argument is a red herring. As the Board notes, the Dodd-Frank Act states that "[n]o provision of this title may be construed as altering, limiting, or otherwise affecting the deference that a court affords to … the Board in making determinations regarding the meaning or interpretation of section 1693*o*-2." 15 U.S.C. §1693b(e)(2). But all that subsection does is make clear that Dodd-Frank doesn't "alter" preexisting "deference that a court" could give "the Board." It is now indisputable that the APA directs courts to "decide all relevant questions of law," 5 U.S.C. §706, and there is no longer

4

*any* background "deference" for the Board to rely on, *see Loper Bright*, 603 U.S. at 391-92, 406-07. The Dodd-Frank Act doesn't purport to displace the APA or the Supreme Court's decision in *Loper Bright*.

As a last ditch plea for deference, the Board says elsewhere that the Court should still "respect" its interpretation because it is "longstanding" and "roughly contemporaneous[]" with Dodd-Frank. Board-Br. 30-31. That sort of analysis has no place here. The Board's interpretation in Regulation II is not a longstanding interpretation deserving any respect. Here, the "only pronouncement" of the Board's interpretation of the Durbin Amendment is in Regulation II—hardly evidence of the Board's "consistent position" throughout the years. *Voss v. Comm'r of Internal Revenue*, 796 F.3d 1051, 1066 (9th Cir. 2015). "[T]hat single [regulation] falls far short of establishing the kind of 'longstanding practice' that might" warrant respect. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1301 (11th Cir. 2022) (quoting *Biden v. Missouri*, 595 U.S. 87, 94 (2022)). Nor does the passage of 14 years since Regulation II's issuance show that the Board's interpretation is longstanding. "Courts have considered agency interpretations to be longstanding when they have been in place *for decades*." *Air Transport Ass'n of Am., Inc. v. USDA*, 2021 WL 1166928, at *13 (D.D.C. Mar. 26, 2021) (emphasis added), *rev'd in part on other grounds*, 37 F.4th 667, 673 (D.C. Cir. 2022). Besides, the Board's erroneous interpretation "'aged nicely,'" *Brown v. Gardner*, 513 U.S. 115, 122 (1994), only because Regulation II went unchallenged for many years due to the combination of erroneous conclusions caused by *Chevron* deference and the assumption that any follow-on cases would be time-barred, *but see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 806 (2024). "'The length of such regulation['s] unscrutinized and unscrutinizable existence' could not alone, therefore, enhance any claim to deference" or respect. *Brown*, 513 U.S. at 122.

But more importantly, after *Loper Bright*, courts "no longer afford deference to the [agency's] reading of the statute." *In re MCP*, 124 F.4th at 997; *see also Quito-Guachichulca v. Garland*, 122 F.4th 732, 735 (8th Cir. 2024) (during "de novo" review, courts "no longer treat the government's view as controlling or even 'especially informative'" (quoting *Loper Bright*, 603 U.S. at 374)). "A regulation's age is no antidote to clear inconsistency with a statute." *Brown*, 513 U.S. at 122. And "no amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one." *Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009). "Even an agency's consistent and longstanding

interpretation, if contrary to statute, can be overruled." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019). For all these reasons, this Court should independently interpret the Durbin Amendment without giving any special weight to the Board's interpretation. That's what the APA requires.

### B. The Board's arguments for creating the third category of costs are erroneous.

**1.** Linney's Pizza explained that the Durbin Amendment unambiguously bifurcates the universe of costs into two—and only two—categories. *See* LP-Br. 13-21. One category is allowable: "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered." 15 U.S.C. §1693o-2(a)(4)(B)(i). The other category is prohibited: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered." *Id.* §1693o-2(a)(4)(B)(ii). Linney's Pizza also explained that the Board's inclusion of a third category of costs (fixed ACS costs, transaction-monitoring costs, fraud losses, and network-processing fees) in the fee standard—which inflated the maximum allowable fee to 21 cents plus ad valorem per transaction— was contrary to the Durbin Amendment's bifurcation of costs. *See* LP-Br. 16-21. In response, the Board argues that the Durbin Amendment prohibits only "consideration of costs not specific to a particular electronic debit transaction" and "did not bar consideration of costs 'that are specific to a particular electronic debit transaction but that are not incremental [ACS costs].'" Board-Br. 15.[1]

---

[1] The proposed intervenors repeat substantially identical arguments in support of the Board's creation of a third category of costs but suggest that Regulation II's current fee standard is too low. *See* Prop.-Intv'rs-Br. 8-15. Unless this Court grants intervention, the proposed intervenors are not parties to the case "entitled to the relief they seek." *Demchak Partners Ltd. P'ship v. Chesapeake Appalachia, LLC*, 2014 WL 4955259, at *5 (M.D. Pa. Sept. 30); *Sevier v. Lowenthal*, 302 F. Supp. 3d 312, 323 (D.D.C. 2018) (denying proposed intervenors' motions for summary judgment "because they are not parties to this case"); *Trs. of Nat'l Ret. Fund v. Fireservice Mgmt. LLC*, 384 F. Supp. 3d 412, 421 (S.D.N.Y. 2019) ("Because Proposed Intervenors are not parties to this action, their motion for summary judgment … is denied as moot."). Though Linney's Pizza doesn't object to treating the proposed intervenors' brief as an amicus brief, neither this Court nor Linney's Pizza needs to engage with the merits arguments raised by amici as though they were parties to the case. *See United States v. Sineng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."); *see also Sierra Club v. EPA*, 964 F.3d 882, 897 n.15 (10th Cir. 2020) ("[An] amicus is not a party, and

But the Board's third category cannot be squared with the Durbin Amendment's command to "distinguish between" two categories of costs, with "strategic[] place[ment]" of "shall" and "shall not." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 100-01 (D.D.C. 2013) ("*NACS I*"); 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii); LP-Br. 14-15. Nor can it be squared with the command to differentiate between incremental ACS costs and "other" costs, which "was intended to subsume *all* costs not explicitly addressed in the first, permissible category of costs." *NACS I*, 958 F. Supp. 2d at 101; *see also* LP-Br. 15. Even the D.C. Circuit observed in *NACS II* that "the terms 'distinguish between' and 'other costs'" provide "textual support" for Linney's Pizza's reading. *NACS II*, 746 F.3d at 487.

The Board's interpretation also contradicts the Durbin Amendment's purpose. *See* LP-Br. 18. The statute's purpose was to reduce the amount of an issuer's interchange fee to a "reasonable and proportional" amount and to require the Board to "consider the functional similarity" between debit-card transactions and checking transactions that clear at par. 15 U.S.C. §1693*o*-2(a)(4)(A). Not only is this purpose "evident in the text," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011), but evident in the historical context, *see All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 169 (5th Cir. 2024) (examining the law's "history" to evaluate the SEC's interpretation). The Board concedes that Congress intervened to regulate the interchange-fee market when the average fee soared to 44 cents. *See* Board-Br. 2; LP-Br. 18. Yet, as here, allowing the Board to ignore the Durbin Amendment's bifurcation of costs subverts the Durbin Amendment's purpose of making the fees "reasonable" and "proportional" to the cost incurred by the issuer per transaction. 15 U.S.C. §1693*o*-2(a)(2); LP-Br. 18. The legislative history also supports Linney's Pizza's textual analysis. *See* LP-Br. 18-19; *Bostock v. Clayton County*, 590 U.S. 644, 674-75 (2020). Senator Durbin explained that "the cost to be considered … is the incremental [ACS] cost … as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction," 156 Cong.

---

[courts] ordinarily decline to consider arguments raised only by an amicus."); *Dalombo Fontes v. Gonzales*, 498 F.3d 1, 2 (1st Cir. 2007) ("[The court] will not address an issue raised by an amicus that was not seasonably raised by a party to the case."). Linney's Pizza nevertheless addresses distinct arguments raised by the proposed intervenors where appropriate.

Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin), which—as the Board previously "admit[ted]"—"divide[s] the universe of costs into two categories," *NACS I*, 958 F. Supp. 2d at 102. The Board doesn't address any of these arguments in its brief. *See* Board-Br. 17-21. Nor does the Board defend its failure to even attempt to classify the universe of incremental ACS costs on the ground that identifying such costs is "administratively difficult." *See* LP-Br. 22 (quoting *NACS I*, 958 F. Supp. 2d at 107). The whole point of the Durbin Amendment was to force the Board to identify and specify those costs by distinguishing them from other costs. The Board's refusal to undertake that work was statutory nonfeasance.

**2.** Rather than address Linney's Pizza's arguments about the Durbin Amendment's text, context, structure, and purpose, the Board raises three arguments that miss the mark. ***First***, the Board points to the textual differences between §1693*o*-2(a)(4)(B)(i) and §1693*o*-2(a)(4)(B)(ii). Board-Br. 17-18. Namely, for the allowable costs, Congress used the phrase "the incremental cost incurred by the issuer for the role of the issuer in the authorization, clearance, or settlement in a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i). But for the prohibited costs, Congress used the phrase "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(ii). The Board argues in conclusory fashion that in subsection (ii), Congress "intended a different meaning than in the preceding clause"; and it says that "[h]ad Congress meant that *only* costs that could be considered in determining what is 'reasonable' and 'proportional' are incremental ACS costs … there are numerous ways it could have said so." Board-Br. 17.

This is a classic rhetorical ploy in cases on statutory interpretation. Litigants can always posit all manner of ways Congress *could have* crafted a statute differently. That tells us little of the meaning of the statute that Congress *did* craft. *See Pulsifer v. United States*, 601 U.S. 124, 137-38 (2024) (rejecting this mode of argument). "[T]o begin with, [courts] do not demand (or in truth expect) that Congress draft in the most translucent way possible." *Id.* at 137. Courts "have 'routinely construed statutes to have a particular meaning even as [they] acknowledged that Congress could have expressed itself more clearly.'" *Id.* at 138 (quoting *Luna Torres v. Lynch*, 578 U.S. 452, 472 (2016)). The question isn't: "Could

8

Congress have" written "in more crystalline fashion"? Instead, the question is: "Is that the right and fair reading of the statute before us?" *Luna Torres*, 578 U.S. at 472-73."

At any rate, Linney's Pizza's reading is the only one that gives effect to every word that Congress passed—"distinguish between," "other" costs, "shall," and "shall not"—and makes sense given the Durbin Amendment's context. *See* LP-Br. 14-19. The Board's interpretation effectively ignores each of these words. The Board does not even acknowledge the terms in its brief. And Linney's Pizza's interpretation effectuates the Durbin Amendment's purpose of lowering the interchange fee to an amount that is reasonable and proportional to the cost incurred by the issuer "with respect to the transaction" and making it more functionally similar to checking transactions that clear at par. 15 U.S.C. §1693*o*-2(a)(2); *id.* §1693*o*-2(a)(3)(A); *id.* §1693*o*-2(a)(4)(A).

**Second**, the Board tries to hinge its interpretation on the word "which" and a comma. It argues that "Congress's use of the phrase 'which are not specific to a particular electronic debit transaction' in section 920(a)(4)(B)(ii) restricts the meaning of 'other costs incurred by the issuer' to only non-transaction-specific costs, and not to all costs other than incremental ACS costs." Board-Br. 19. In the Board's view, "[h]ad Congress intended 'which are not specific to a particular electronic debit transaction' merely to describe—but not restrict—other costs, it would have set the 'which' clause off with a comma or parentheses." *Id.* But contrary to that view, when the Durbin Amendment says "other costs *which* are not specific to a particular electronic debit transaction, which costs shall not be considered," 15 U.S.C. §1693*o*-2(a)(4)(B)(ii) (emphasis added), the first *which* clause describing "other costs" is used descriptively and nonrestrictively. In other words, the Durbin Amendment describes "other costs" that are "not specific to a particular electronic debit transaction" and thus should be excluded, as opposed to meaning that *only* those "other costs" that are "not specific" to a transaction should be excluded. *See NACS I*, 958 F. Supp. 2d at 101-02. "[T]he word 'which' suggests that the clause is nonrestrictive." *Rhodes v. County of Darlington*, 833 F. Supp. 1163, 1190 n.18 (D.S.C. 1992); *see also NACS I*, 958 F. Supp. 2d at 101-02; *United States v. Indoor Cultivation Equip.*, 55 F.3d 1311, 1315 (7th Cir. 1995) ("Congress's use of the pronoun 'which' is significant; it introduced a nonrestrictive clause—'*which* are used to … facilitated [drug transactions]'—that does not limit the meaning of the

word it modifies—'conveyance.'"). Though Congress did not set off that clause with a comma, "commas are not necessary." *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017) (en banc) (rejecting argument that the clause in question was restrictive because it was "not separated … by a comma").

Besides, courts routinely reject interpretative arguments that turn entirely on the placement of punctuation. "[A] purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). "No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning," because "[s]tatutory construction 'is a holistic endeavor.'" *Id.* at 455. Punctuation is "'not an absolute and can assuredly be overcome by other indicia of meaning.'" *United States v. Boulding*, 960 F.3d 774, 779 (6th Cir. 2020) (quoting *Lockhart v. United States*, 577 U.S. 347, 352 (2016)). "[T]ext and context" may supply even an "awkwardly phrased" statute with a "straightforward reading." *Lockhart*, 577 U.S. at 351. And "the words of a statute must be read in their context" and "as a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up).

It is also well settled that *which* clauses can bear a nonrestrictive meaning without a comma. *See* Antonin Scalia & Bryan Garner, *Reading Law* 142 (2012) (giving as an example, "Republicans oppose new taxes which are unnecessary," which could have the non-restrictive meaning that "all new taxes are anathema"). And placing the decisive weight on a comma, as the Board does here, is ultimately "a weak basis for deciding statutory meaning" given that grammarians have been "unsuccessful" in establishing the convention for preferring "comma-*which* for nonrestrictive [clauses]" "as a firm rule." *Id.* More important, when interpreting statutes, punctuation—and a strict "grammarian's" approach— can be "override[n]" in order to "give[] effect to every word" of the statute. *Id.* at 143; *see also id.* at 165 (explaining that punctuation can be "too weak to trump" "the overwhelming evidence from the structure, language, and subject matter" of the law). As explained above, given the Durbin Amendment's text, context, structure, and purpose, Linney's Pizza's interpretation is the only one that produces a coherent understanding. The Board's comma-driven interpretation vitiates the Durbin

10

Amendment's text, context, structure, and purpose by "improperly narrowing the scope of *excluded* costs." *NACS I*, 958 F. Supp. 2d at 106.[2]

**Third**, the Board resists application of the major-questions doctrine. *See* Board-Br. 31-32. Yet the Board's brief itself shows why the major-questions doctrine applies. The Board's claim of broad discretion to consider the nonstatutory costs—which allowed the Board to inflate the interchange fees by the billions—is based entirely on the *absence* of a comma and the Durbin Amendment's purported *silence* about those costs. *See* Board-Br. 19-20; LP-Br. 18. The major-questions doctrine demands "more than a merely plausible textual basis for the agency action," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), and requires agencies to pinpoint where Congress "clearly … authoriz[ed]" it to act, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2012) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Silence and the absence of a comma just aren't enough to prove clear authorization for this new, third category of costs.

The Board doesn't dispute that the interchange fees involve a question of "economic and political significance" which triggers the major-questions doctrine. *West Virginia*, 597 U.S. at 721; *see* LP-Br. 19-20. The Board nevertheless argues that the major-questions doctrine doesn't apply because

---

[2] The Board also suggests that Linney's Pizza's reading would "render[] the phrase 'which are not specific to a particular electronic debit transaction' surplusage." Board-Br. 21; *see id.* 16. Yet if the Board is right, then that would mean that every non-restrictive clause in the U.S. Code is surplusage. Furthermore, the Sixth Circuit has recognized that "the canon against surplusage is 'not an absolute rule,'" as "Congress may use surplus language 'to remove doubt.'" *United States v. Knight*, 2023 WL 5338637, at *5 (6th Cir. Aug. 18, 2023) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013)); *see also In re Simply Essentials, LLC*, 78 F.4th 1006, 1009 (8th Cir. 2023) ("It is not unreasonable that Congress would repeat itself in order to ensure that the results it intended were followed."). "Redundancies across statutes are not unusual events in drafting, and so long as there's no 'positive repugnancy' between two laws, a court must give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). And "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). At any rate, "the canon against surplusage 'assists only where a competing interpretation gives effect to every clause and word of a statute.'" *Marx*, 568 U.S. at 385. It doesn't help the Board here, because the Board's reading itself would render ineffective the Durbin Amendment's bifurcation of costs by making even more terms (e.g., "distinguish between," "other" costs, "shall," and "shall not") superfluous.

the effect of excluding nonstatutory costs amounts to "compel[ling] the Board to assert greater 'regulatory power'" by lowering the maximum allowable interchange fee. Board-Br. 32. That assertion is illogical. It is *the Board* that claimed the broad discretion to consider any and all costs in the fee standard. "'[N]owhere'" in the Durbin Amendment "'do we find words' expressly giving" the Board such powers. *All. for Fair Bd. Recruitment*, 125 F.4th at 180. And the Board can't explain how an administrative rule preventing excessive interchange fees is any greater assertion of regulatory power than the existing Regulation II, which authorized a seismic economic shift by reinterpreting the Durbin Amendment to permit issuers to overcharge small merchants and their consumers.

For all these reasons, the Board's interpretation—and its consideration of the third category of nonstatutory costs—contradicts the Durbin Amendment's text, context, structure, and purpose.[3]

### C. The Board's arguments for including the prohibited costs in the fee standard are erroneous.

Linney's Pizza explained why the specific nonstatutory costs that the Board included in the fee standard fail for independent reasons. LP-Br. 21-27. The Board's arguments to the contrary are unavailing. *See* Board-Br. 20-26.

**Fixed ACS Costs**. According to the Board, "fixed ACS costs are specific to a particular debit card transaction because, without these costs, no transaction could occur." Board-Br. 20. But the Board ignores the Durbin Amendment's statutory command that it "shall not" consider costs that are "not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). Fixed costs are, "[b]y definition … not associated with any particular" transactions. *San Antonio v. United States*, 631 F.2d 831, 851 n.111 (D.C. Cir. 1980); *Autotrol Corp. v. Cont'l Water Sys. Corp.*, 918 F.2d 689, 692 (7th Cir. 1990) (Posner, J.) ("[F]ixed" costs, "as the name implies, are the same whether or not the [business] does anything," while specific or "[v]ariable costs are those that vary … by fluctuations in

---

[3] The proposed intervenors assert that "capping" the fee standard would somehow raise constitutional concerns because it could lead to a "confiscatory" rate down the road. Prop.-Intv'rs-Br. 14-15. But any future constitutional challenge to a revised fee standard as "confiscatory" is purely conjectural at this point. The Board hasn't even been ordered to fix the fee amount to be in line with the Durbin Amendment's text. And no one even knows what the fee amount will be. If the proposed intervenors think that future rate is "confiscatory," then they can raise that challenge then.

that [business's] activity."). It's a stretch to argue that the fixed ACS costs are "specific" to a "particular" debit-card transaction in the same way that it would be "a stretch if a shoe store claimed that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale." *NACS II*, 746 F.3d at 489.

Facing that plain-text understanding of "fixed costs," the Board pivots to rewriting the Durbin Amendment to say that the Board may consider any costs without which "no transaction could occur." Board-Br. 20. But that's not what the Durbin Amendment says. It prohibits the Board from considering costs that are "not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). Congress's clear word choice—not the Board's reimagining of it—controls here.

Next, the Board asserts that it included fixed ACS costs in the fee standard because it would be difficult to delineate between incremental ACS costs and fixed ACS costs. Board-Br. 20-21. Linney's Pizza addressed that point (at 22) head on and pointed to the Supreme Court's clear command that "practical considerations … do not justify departing from the statute's clear text." *Pereira v. Sessions*, 585 U.S. 198, 217 (2018); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 7 (D.C. Cir. 2009) ("That a problem is difficult may indicate a need to make some simplifying assumptions, but it does not justify ignoring altogether a variable so clearly relevant and likely to affect the calculation[.]" (citation omitted)). The Board fails even to address that command. And the Board's assertion of practical difficulties is largely a problem of its own creation. The Board claimed that the practical difficulty arose from the fact that issuer banks' cost-accounting systems were "not generally set up to differentiate between fixed and variable costs," that the costs could be categorized as fixed or variable "depend[ing] on the relevant time horizon," and that the line between fixed and variable costs is not so clear. Regulation II, 76 Fed. Reg. 43,394, 43,427 (July 20, 2011). But these difficulties could be obviated if the banks simply cleaned up their accounting. In any case, bank systems are not a reason to discard Congress's mandate.

**Transaction-Monitoring Costs.** The Board argues that the transaction-monitoring costs were properly included in the fee standard because they are "pre-authorization fraud-prevention activities" that are "integral to transaction authorization." Board-Br. 22. In other word, these costs are

the same as authorization costs. This argument fails for two reasons. ***First***, the Board has never treated transaction *monitoring* to be the same as *authorization*. Transaction monitoring may "*assist* in the authorization process." Updated Rule, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015) (emphasis added). And it may even be "*integral to* the authorization decision" by providing fraud-related information. Regulation II, 76 Fed. Reg. at 43,431 (emphasis added). The most that the American Bankers Association's amicus brief can say is that transaction monitoring is "*related to* authorization." ABA-Amicus-Br. 8 (emphasis added). But the Board itself has never *equated* transaction monitoring to authorization, which generally involves the step of "confirming that a card is valid," "authenticating the cardholder," and verifying the account "has sufficient funds to cover the transaction amount." Regulation II, 76 Fed. Reg. at 43,396, 43,431. Instead, transaction monitoring has always been understood to be a "paradigmatic example of fraud-prevention costs." *NACS II*, 746 F.3d at 492. And even now, the most that the Board can say is that the transaction-monitoring costs should be included because it's a fraud-prevention activity that occurs *during* authorization.

**Second**, and perhaps more important, the Board's interpretation renders ineffective the comprehensive fraud-prevention-cost adjustment scheme that Congress separately created. As Linney's Pizza explained, Congress did not want issuer banks to be compensated for fraud-prevention activities—like transaction monitoring—without condition. *See* LP-Br. 22-24. Instead, Congress wanted "allowance for costs incurred by the issuer in preventing fraud" to be made (i) *after* calculating the fee standard *and* (ii) only if the issuer "complies with the fraud-related standards." 15 U.S.C. §1693*o*-2(a)(5)(A)(i)-(ii); *see also* LP-Br. 24 (citing 156 Cong. Rec. 5925). The Durbin Amendment states that the Board "may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2)"—that is, the interchange fee—"if" two conditions are met. 15 U.S.C. §1693*o*-2(a)(5)(A). "[S]uch adjustment" must be "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving the issuer." *Id.* §1693*o*-2(a)(5)(A)(i). And the issuer must "compl[y] with the fraud-related standards established by the Board." *Id.* §1693*o*-2(a)(5)(A)(ii).

Critically, Congress did not differentiate between fraud-prevention activities that occur during authorization and those that occur after authorization. Instead, Congress swept all fraud-prevention activities under the conditional requirements and even prescribed specific factors that the Board shall consider. *See id.* §1693o-2(a)(5)(A)(ii)(II) (the Board shall "require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions"); *id.* §1693o-2(a)(5)(B)(ii)(I) (requiring considering, among others, "the nature, type, and occurrence of fraud in electronic debit transactions"). The Board itself admits (at 22) that "these transaction-monitoring activities inherently include a fraud-prevention component." The Board's decision to reward issuer banks for fraud-prevention activity as part of the base interchange fee—without even needing to satisfy the Durbin Amendment's conditional requirements—negates the carefully designed scheme to incentivize fraud prevention. *See* LP-Br. 23-24.

**Fraud Losses.** The Board's counterarguments for why fraud losses can be included in the interchange fee are unpersuasive. *See* Board-Br. 24-25. ***First***, the Board clings to a competing dictionary to say that "costs" also include "loss." Board-Br. 25. But "[t]hat a [dictionary] definition is broad enough to encompass one sense of a word does not establish … that the word is ordinarily understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012). The "statutory context" is key. *Id.* at 568-69. In the Durbin Amendment, Congress allowed the consideration of an "incremental cost incurred by an issuer for the role in the authorization, clearance, or settlement of a particular electronic debit transaction," and it prohibits the consideration of "other costs which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). In this context, the statute plainly uses the term "cost" in the way that Linney's Pizza uses it: as the "amount paid or charged" for effectuating authorization, clearance, and settlement. LP-Br. 24 (quoting Cost, *Black's Dictionary* (9th ed. 2009)). The Board (again) concedes that fraud losses are "'the *result* of the authorization, clearance, and settlement.'" Board-Br. 24 (emphasis added) (quoting Regulation II, 76 Fed. Reg. at 43,431). "[T]he *consequence* of ACS—as opposed to ACS costs themselves—are not to be considered under the plain language of the statute." *NACS I*, 958 F. Supp. 2d at 108.

15

**Second**, the Board *admits* that fraud losses are only "generally" attributable to processing a transaction. The Board must mean, then, that they are not "specific to a particular transaction." Yet the Board presses on despite that concession. As Linney's Pizza explained, Regulation II requires merchants to pay 0.05% of a transaction's value to issuers for fraud losses in every transaction *regardless* of whether a fraud loss occurs in that transaction. LP-Br. 25. The logic of that reading—which embraces the idea that merchants could be required to pay "'anticipatory payments,'" Board-Br. 25— cannot be reconciled with the Durbin Amendment's text. The Board doesn't even explain why such anticipatory payments are "specific" to a "particular" transaction. Nor does the Board offer any explanation that can override the Durbin Amendment's text that says the cost be "incurred"—not *might be incurred* or *could be incurred*. LP-Br. 25.

**Third**, the Board misconstrues Linney's Pizza's argument about the fraud-prevention adjustment. It suggests that the fraud-prevention provisions are supposed to directly compensate the issuer banks for fraud losses. *See* Board-Br. 25. Not so. Linney's Pizza argued that the Board's reading—and decision to compensate issuer banks for fraud losses regardless of whether the issuer banks implement fraud-prevention measures—completely negates the incentive structure Congress carefully created. *See* LP-Br. 25-26. "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). If a bank can recoup fraud losses (as it already does under Regulation II) regardless of whether it implements any fraud-prevention measures, that removes the critical incentive for the banks to invest in and implement fraud-prevention measures that would stop fraud losses in the first place. The Board doesn't engage with the Durbin Amendment's structure at all on this point.

**Network-processing Fees.** The Board argues that it properly included the network-processing fees in the fee standard. Board-Br. 25-26. The Board insists that such fees must be included because "network processing fees, although paid by issuers to networks, are incurred 'for the role of the issuer.'" *Id.* at 26. But network fees are "charged and received by a payment card network with respect to an electronic debit transaction." 15 U.S.C. §1693*o*-2(c)(10). And they are paid by "both the issuer and the acquirer" alike for the *network's* role in the electronic debit transaction. *NACS II*, 746

F.3d at 479. It's not a fee incurred "for the role of the *issuer* in the authorization, clearance, or settlement." 15 U.S.C. §1693*o*-2(a)(4)(B)(i); *see also id.* §1693*o*-2(c)(8) (interchange fee is established "for the purpose of compensating an issuer for *its* role in an electronic debit transaction" (emphasis added)). So the Board's reading fails as a threshold matter.

What's more, the Board's interpretation—which compensates issuers for network fees—contradicts the plain text of the Durbin Amendment, which says that "a network fee" should not be "used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." *Id.* §1693*o*-2(a)(8)(B)(i); *see also* LP-Br. 26. The Board resists this provision by asserting that "this language says nothing at all about which costs the Board may consider in establishing interchange fee standards." Board-Br. 26. But that's also not right. The Durbin Amendment gives rulemaking authority to the Board to "prescribe regulations … regarding *any* network fee." 15 U.S.C. §1693*o*-2(a)(8)(A) (emphasis added). And it further states that the rulemaking authority "shall be limited to regulations to ensure that (i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and (ii) a network fee is not used to circumvent or evade the restrictions of this subsection." *Id.* §1693*o*-2(a)(8)(B). In its plain terms, the Durbin Amendment requires the Board to ensure that network fees do *not* compensate issuer banks.

The Board suggests that this provision concerns only "a situation where a network lowers network processing fees paid by issuers … while raising similar fees charged to merchants or acquirers by the same amount." Board-Br. 26 n.5. But such limitations don't appear in the Durbin Amendment. And even if the collusion the Board identified were the "principal evil Congress was concerned with," the Durbin Amendment's "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Here, the Durbin Amendment doesn't mince words: Network fees should not compensate an issuer "with respect to an electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(8)(B)(i). The Board exceeded its authority when it included network-processing fees in the interchange-fee standard.

17

**D.    The Board's arguments for setting a one-size-fits-all fee standard are erroneous.**

Linney's Pizza explained why the Durbin Amendment requires an issuer-specific and transaction-specific fee standard and that the Board erred in setting a one-size-fits-all fee standard across all issuers and transactions. LP-Br. 27-30. The Board defends its "representative issuer" approach and argues that there is "no principled reason to read [the Durbin Amendment] as requiring an issuer-by-issuer approach." Board-Br. 27. The principled reason, however, is that the plain text of the Durbin Amendment requires that result. *See* LP-Br. 27-30.

The Durbin Amendment states: "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to *the* cost incurred by *the* issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2) (emphasis added). And the Durbin Amendment tasks the Board with promulgating a fee standard for "assessing whether the amount of any interchange transaction fee in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693*o*-2(3)(A). Allowing every issuer to recover the same amount—21 cents plus 0.05% of each transaction— regardless of the costs that the issuer actually incurs cannot possibly be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." More problematically for the Board, the Durbin Amendment nowhere refers to a *representative* issuer. Rather, it refers first to the fee that "an issuer" may receive and later sharpens that reference by stating that such fee shall be reasonable and proportional to the costs incurred by "the issuer," signaling that the fees any issuer may recover must correspond the costs incurred by *that specific* issuer. And in any event, the Board must conjure its pivotal word *representative* out of thin air in each instance to make the Durbin Amendment refer to a *representative* issuer. The Board's reference to a "*representative*" issuer relies on words that are "not the words that Congress wrote." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 123 (2018).

The Board still argues that the definite article *the* "can also refer 'to a term used generically or universally.'" Board-Br. 28 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 527 (2014)). But here, the Board's insistence on reading the article *the* as having a universal scope is itself "overly formalistic." *Id.* (quoting *Georgetown U. Hosp. v. Sullivan*, 934 F.2d 1280, 1284 n.4 (D.C. Cir. 1991)). The Board's

proffered reading of *the* cannot be reconciled with the broader context provided by other framework of other provisions of the Durbin Amendment. *See* LP-Br. 27-29; *cf. Noel Canning*, 573 U.S. at 528 (looking at "the Clause's purpose" and history to decide the meaning of the phrase "the recess of the Senate"). The Durbin Amendment directs the Board to consider "the incremental cost by an issuer for the role of the issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i) (emphasis added).[4] As Linney's Pizza explained, the statute requires the Board to tie the "cost" that issuers can recover to "particular" transactions. The statute also requires that the interchange fee be "proportional" to the cost incurred. *Id.* §1693*o*-2(a)(2). This plainly means that the fee standard must be "particular" to each issuer and "proportional" to issuer-specific costs. *See* LP-Br. 27-29. And relatedly, the Board doesn't even try to address how the phrase "a particular electronic debit transaction" can be read to mean a *representative* transaction. Board-Br. 28-29. Instead, it mischaracterizes Linney's Pizza's argument as somehow "recogniz[ing] that the statutory language does not compel … different fee levels for individual transactions." Board-Br. 27. Linney's Pizza argued that the Durbin Amendment requires that the fee standard be transaction-specific. LP-Br. 27-29.

Rather than engage with the Durbin Amendment's text, the Board resorts to the absurdity canon, arguing that implementing an issuer-specific and transaction-specific fee standard would be difficult. Board-Br. 28. Yet again, practical considerations simply do not "justify departing from the statute's clear text." *Pereira*, 585 U.S. at 217; *Comcast Corp.*, 579 F.3d at 7. Nor does the absurdity doctrine apply. That doctrine requires clearing a "high" bar, and the Board comes nowhere close. *Tex.*

---

[4] The Board also suggests that the Court should disregard the general rule that the definite article *the* indicates a singular, specific issuer, because it notes that these passages also "use the indefinite article 'a,' which 'means "one" or "any."'" Board-Br. 29 (quoting *Black's Law Dictionary* (5th ed. 1979)). It therefore thinks that "the" and "a" should be treated as interchangeable and given the same universal meaning. *Id.* But that suggestion violates the principle that "different terms usually have different meanings," especially when both terms are used in the same provision. *Pulsifer*, 601 U.S. at 149 (citing Scalia & Garner, *supra*, 170-71). This principle is best seen by giving proper meaning to the definite and indefinite articles used: "The amount of any interchange transaction fee that *an* [any] issuer may receive or charge with respect to *an* [any] electronic debit transaction shall be reasonable and proportional to *the* [specific] cost incurred by *the* [specific] issuer with respect to *the* [specific] transaction." 15 U.S.C. §1693*o*-2(a)(2) (emphasis added).

*Brine Co., LLC v. Am. Arb. Ass'n*, 955 F.3d 482, 486 (5th Cir. 2020). Before a party can "invoke the doctrine of 'absurd or mischievous consequences' to rewrite the statute, it must demonstrate that the plain meaning of the statutory text 'defies rationality by rendering a statute nonsensical and superfluous.'" *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 596 (D.C. Cir. 2015) (Kavanaugh, J.). It must show that the result is "preposterous, one that 'no reasonable person could intend.'" *Id.* (quoting Scalia & Garner, *supra*, at 237). Even if the statute yields a more significant outcome, "a 'drafter's failure to appreciate the effect of certain provisions' … by itself does not constitute an absurdity." *Id.* (quoting Scalia & Garner, *supra*, at 238). "It may be good (or bad) policy, but it's light years away from absurd." *Thomas v. Reeves*, 961 F.3d 800, 817 (5th Cir. 2020) (Willett, J., concurring in the judgment). And that doctrine certainly "does not license courts to improve statutes … substantively, so that their outcomes accord more closely with judicial beliefs about how matters out to be resolved." *Jaskolski v. Daniels*, 427 F.3d 456, 461 (7th Cir. 2005). It is "insufficient for the Court to merely dislike the result; rather, it must be 'patently illogical or contrary to Congress's intent.'" *LifePoint Corp. Servs. Gen. P'ship v. WellCare Health Ins. Co. of Ky.*, 2023 WL 2388551, at *4 (E.D. Ky. Mar. 7, 2023) (Van Tatenhove, J.) (quoting *Chapman v. Higbee Co.*, 319 F.3d 825, 832 (6th Cir. 2003)).

Here, it's not at all unthinkable that Congress had an issuer-specific and transaction-specific approach in mind. For instance, the adjustments for fraud-prevention measures, *see* 15 U.S.C. §1693*o*-2(a)(5), are "issuer-specific" and "each issuer must individually demonstrate that it complies with the standards established by the Board," 156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin). If a fraud-prevention adjustment is to be made on an issuer-specific basis, it's similarly workable and reasonable to make base-component calculations on an issuer-specific basis. Legislative history further defeats the Board's absurdity argument. *See* Scalia & Garner, *supra*, at 388 ("legislative history" can "refute attempted application of the absurdity doctrine"). Senator Reed explained that the Durbin Amendment "ensur[es] that fees charged to merchants by credit card companies for debit card transactions are both reasonable and proportional to the cost of processing *those* transactions." 156 Cong. Rec. S5914 (daily ed. July 15, 2010) (Statement of Sen. Reed) (emphasis added).

But most importantly, Congress authorized the Board to "require any issuer … or payment card network to provide the Board with such information as may be necessary" so that the Board could issue "bi-annual" reports disclosing "summary information concerning costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks." 15 U.S.C. §1693*o*-2(a)(3)(B). Prior to Regulation II itself, "issuers were instructed to [provide the Board] the total costs associated with providing authorization for transactions" and "clearing and settlement." Regulation II, 76 Fed. Reg. at 43,433. And the Board has since collected granular ACS cost information from covered issuers. *See, e.g.*, Federal Reserve, 2021 Interchange Fee Revenue, Covered Issuer Costs, & Covered Issuer & Merchant Fraud Losses Related to Debit Card Transactions 24-30 (Oct. 2023), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2021.pdf. In other words, Congress directed the Board to collect issuer-specific costs, and the Board has been doing just that. *See also* Regulation II, 76 Fed. Reg. at 43,397 (calculating the "average interchange fee" based on the different costs incurred by issuers). And contrary to the proposed intervenor's incorrect suggestion that the Board only collects "aggregate" or "summary" data on costs (at 23), to the extent the Board needs even more granular data, Congress has authorized the Board to collect it, 15 U.S.C. §1693*o*-2(a)(3)(B) ("The Board may require any issuer … to provide the Board with such information as may be necessary to carry out the provisions of this subsection."). So when the Durbin Amendment requires that "[t]he amount of any interchange transaction fee … be reasonable and proportional to the cost incurred by the issuer with respect to the transaction," it naturally means the fee must be reasonable and proportional to what a particular issuer incurred in a particular transaction. *Id.* §1693*o*-2(a)(2).[5]

The Board's invocation of "discretion" or general rulemaking authority also does not allow the Board to ignore the Durbin Amendment's command to set an issuer-specific and transaction-specific fee standard. Board-Br. 30. An agency's obligation to stay "within the bounds of its statutory

---

[5] The Board claims that Linney's Pizza "misquotes" 15 U.S.C. §1693*o*-2(a)(4)(B). Board-Br. 27. But the Board is mistaken. The line it identifies—"[r]ather than issue a standard that is 'particular' to each issuer and 'proportional' to issuer-specific costs," LP-Br. 29—merely synthesizes Linney's Pizza's preceding argument about "issuer-specific and transaction-specific" fees, *id.* at 27-30.

authority" is the "price" of the delegation of authority. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (cleaned up). The Durbin Amendment's text cabins the Board's discretion, and the Board cannot "stray" "beyond" the "outer statutory boundary" that "Congress created." *Tex. Med. Ass'n*, 110 F.4th at 776.

## II. Regulation II is arbitrary and capricious.

The APA requires this Court to "hold unlawful and set aside" agency action that is "arbitrary" and "capricious." 5 U.S.C. §706(2)(A). Arbitrary-and-capricious review "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," "offered an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983).

### A. The Board cannot justify its failure to consider the functional similarities between debit and checking transactions.

The Durbin Amendment requires that "[i]n prescribing regulations … the Board shall consider the functional similarity between (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par." 15 U.S.C. §1693o-2(a)(4)(A). "[T]he mandatory 'shall' normally creates an obligation impervious to … discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). And if it is to avoid acting arbitrarily and capriciously, an agency must show that it considered "all relevant statutory factors" when it acts. *Carlson*, 938 F.3d at 345. "When Congress orders a decisionmaker to 'consider' a list of factors, Congress is instructing that '[e]ach factor must be given genuine consideration and 'some weight' in the final determination.'" *Tex. Med. Ass'n*, 110 F.4th at 778 (quoting *Pub. Serv. Co. of Ind. v. ICC*, 749 F.2d 753, 763 (D.C. Cir. 1984)). In other words, the agency "'is not free to ignore any individual factor entirely.'" *Id.*

Linney's Pizza explained that the Board did not adequately consider the functional similarity between debit-card and checking transactions when it issued the fee standard, including when the Board decided to include the four nonstatutory costs. *See* LP-Br. 31-33. In response, rather than explain *how* Regulation II considered the functional similarity, the Board baldly asserts that it did consider the functional similarity. *See* Board-Br. 33-34. But merely "[s]tating that a factor was considered … is not a substitute for considering it." *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *accord Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024). The agency must provide more than "conclusory statement" to prove that it "consider[ed] [the relevant] priorities." *Getty*, 805 F.2d at 1057. Here, all the Board can muster is that conclusory statement. *See* Board-Br. 33-34.

Though the Board (in parenthetical citations) points to three instances where it supposedly considered the functional similarity of checking transactions, those citations don't show that the Board adequately considered the functional similarity. *See* Board-Br. 33-34. For example, the Board says that it considered the functional similarity to *exclude* certain types of costs (such as card-production, card-delivery, marketing, R&D, compliance, and customer inquiry costs). *Id.* at 34 (citing Regulation II, 76 Fed. Reg at 43,428, 43,429). But even assuming those discussions are evidence of adequate deliberation over the decision to exclude those costs, they don't show that the Board considered the functional similarity when it *included* fixed ACS costs, transaction-monitoring costs, fraud losses, and network-processing fees. And as Linney's Pizza already explained, Regulation II and the Updated Rule don't show how—or that—the Board considered the functional similarity when factoring in these nonstatutory costs. *See* LP-Br. 32-33. The Board also says that it considered the functional similarity when it included network-processing fees because it observed that "'such an arrangement would be similar to traditional paper-check processing.'" Board-Br. 34 (quoting Regulation II, 76 Fed. Reg. at 43,430). Yet, as Linney's Pizza already explained, Regulation II also said that in "electronic check collection systems, both the payee's bank and the payor's bank generally pay processing fees." Regulation II, 76 Fed. Reg. at 43,430; LP-Br. 32-33. But Regulation II doesn't explain why network-processing fee should still be included.

23

The Board further says that "there was no requirement that debit transactions clear at par, as checking transactions do." Board-Br. 33. That is a red herring. Even if the Durbin Amendment doesn't categorically require that debit-card transactions clear at par, it still requires the Board to consider the functional similarity between debit-card transactions and checking transactions that clear at par when setting the fee standard. The functional similarity thus must be "'given genuine consideration,'" and the Board can't just "'ignore'" it. *Tex. Med. Ass'n*, 110 F.4th at 778. The Board did ignore it here, and the fee standard is arbitrary and capricious for that reason.

### B. The Board cannot rebut Linney's Pizza's arguments that the Board failed to define "incremental costs" and improper inclusion of prohibited costs.

Linney's Pizza explained that the fee standard is arbitrary and capricious because the Board "relied on factors which Congress has not intended it to consider." *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016); LP-Br. 33-35. The Board's one-paragraph response barely tries to rebut this argument. For instance, Linney's Pizza explained that the Board incorrectly claimed the discretion to consider "all costs related to a particular transaction," Regulation II, 76 Fed. Reg. at 43,427, when the Durbin Amendment required the Board to consider only the incremental ACS cost and exclude all other costs, 15 U.S.C. §1683*o*-2(a)(4)(B)(i)-(ii). *See also* LP-Br. 33. The Board doubles down that it "did not need to distinguish incremental ACS costs from non-incremental ACS costs." Board-Br. 34. But because the Board's interpretation is incorrect, its inclusion of the nonstatutory costs is necessarily arbitrary and capricious. *See Sierra Club*, 828 F.3d at 407; *see also Michigan v. EPA*, 576 U.S. 743, 751 (2015) (holding that it was arbitrary and capricious for EPA to not give "cost no thought *at all*" when it "considered cost irrelevant to its initial decision to regulate").

And as Linney's Pizza explained, the fee standard is arbitrary and capricious for an additional reason. The Board failed to "define adequately key terms." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1201-02 (10th Cir. 2001); *see also Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (observing that reasoned decisionmaking "necessarily implies some definitional content" to key terms). The Board freely admits that it didn't even try to define "whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement," Regulation II, 76 Fed. Reg. at

24

43,427,[6] even though the Durbin Amendment requires the Board to "distinguish between" "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and "other costs," 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Without key definitions, the Board simply drew arbitrary lines between what costs can be included and what costs must be excluded. LP-Br. 34-35. And even if the Board was right that it could consider "all costs *related to* a particular transaction" (again, it cannot), the Board didn't bother to define what that phrase means, further allowing the Board to engage in wholly arbitrary line drawing as to what costs were included and what were not. *See* LP-Br. 34-35.

### C. The Board fails to rebut Linney's Pizza's argument that the Board improperly rejected an issuer-specific and transaction-specific fee standard.

As Linney's Pizza explained above, the Board's rejection of an issuer-specific and transaction-specific fee standard rested on an incorrect interpretation of the Durbin Amendment. *Supra* 18-21. Because the Board "relied on factors which Congress has not intended it to consider," the fee standard is arbitrary and capricious. *Sierra Club*, 828 F.3d at 407.

## III. Vacatur with a stay is the appropriate remedy.

The Board doesn't dispute—and thus concedes—that if the Court were to invalidate Regulation II after finding that it is contrary to law, then the proper remedy is to vacate the rule. *See* Board-Br. 35-36. Because the fee standard is contrary to law, this Court should vacate the rule with a stay.

The Board argues only that if the Court finds Regulation II arbitrary and capricious (what the Board calls "purely procedural grounds"), then it should remand for "any necessary corrective action without vacating [Regulation II]." *Id.* But the APA itself forecloses the alternative remedy that the

---

[6] The proposed intervenors attempt to resuscitate the Board's failure to define "incremental cost" by offering its own definition that "[a] cost is an 'incremental' ACS cost if it is incurred because of an issuer's role in the ACS process." Prop.-Intv'rs-Br. 17. Not only is that reading wrong, but the Board expressly refused to define what incremental cost means. The proposed intervenors cannot substitute their definition for the Board's (non)definition. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'").

Board proposes. If this Court finds Regulation II "arbitrary" and "capricious," then it "shall hold unlawful and set aside" Regulation II. 5 U.S.C. §706(2). And contrary to the Board's arguments, "countless decisions" have vacated rules after finding the agency action arbitrary and capricious. *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring) (citing *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020), which held that "the [DACA] rescission must be vacated" after finding it arbitrary and capricious); *Kentucky*, 123 F.4th at 471, 473 (vacating where the "EPA acted arbitrarily and capriciously"). Indeed, many jurists have questioned whether the APA even authorizes remand without vacatur in any case, because that remedy "conflict[s]," *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 n.5 (D.C. Cir. 2024), with the APA's command that the reviewing court "shall … set aside" unlawful agency action, 5 U.S.C. §706(2). *See also Comcast Corp.*, 579 F.3d at 10  (Randolph, J., concurring) (observing that the APA "contains no exception" to the command to "vacate" and that "arbitrary, capricious, or otherwise unlawful agency action must be set aside '[i]n all cases'"); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting) (remand without vacatur "depart[s] from the literal command of the [APA's] language").

Faced with the APA's plain text, the Board cites (at 35) *Sierra Club v. EPA*, 60 F.4th 1008 (6th Cir. 2023), as though it supports the viability of remand without vacatur. But *Sierra Club* is inapposite. As the Sixth Circuit recently explained, the *Sierra Club* decision "did not find the action unlawful" and "says nothing about whether [courts] may refuse to vacate *illegal* actions" including those that violate the APA for being arbitrary and capricious. *Kentucky*, 123 F.4th at 472. Refusing to vacate in this case would mean that this Court will be "break[ing] new ground" ahead of the Sixth Circuit. *Id.* And for its part, the Sixth Circuit has not hesitated to vacate agency action that was the result of so-called procedural flaws. *See, e.g.*, *In re MCP*, 124 F.4th at 1013; *Kentucky*, 123 F.4th at 473; *cf. Tennessee v. Cardona*, --- F. Supp. 3d ---, 2025 WL 63795, at *5, 7 (E.D. Ky. Jan. 9, 2025). This Court should therefore follow the APA's unambiguous command and vacate Regulation II.

In any event, the Board cannot show its entitlement to remand without vacatur, which is a "rare" remedy. *Kentucky*, 123 F.4th at 473; *accord Bridgeport Hosp.*, 108 F.4th at 890 ("an 'exceptional remedy'"). Even under the decisions that have permitted remand without vacatur, agencies must show

that the error is "curable," *Bridgeport Hosp.*, 108 F.4th at 890, and that there is "at least a serious possibility that they will be able to reach the same outcome on remand.'" *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 918 (D.C. Cir. 2024) (cleaned up); *see also Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024) ("[T]o remand without vacatur, we must first find that the agency can correct the error on remand" and "(re)enact the same policy"). Remand without vacatur is "inappropriate for agency action suffering from one or more serious procedural or substantive deficiencies." *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). Here, each of Linney's Pizza's arguments showing the Board acted arbitrarily and capriciously highlights how the Board set a calculated rate by relying on factors it should not have relied on. The Board cannot simply "cure" this flawed calculation or reach the "same outcome on remand" when the prohibited factors are removed from the equation. For these reasons, vacatur is the appropriate remedy if the Court finds Regulation II contrary to law or arbitrary and capricious.

More to the point, vacatur of the rule with a temporary stay is the most equitable remedy in this case. If the Court were to remand without vacatur, "[o]ne might expect that the Agencies will move 'promptly' on remand" to correct its error. *Marin Audubon Soc'y*, 121 F.4th at 919. "But an expectation is not an obligation." *Id.* If the Board "take[s] too long" and fails to promulgate a lawful fee standard, Linney's Pizza—a small business that already has paid and is continuing to pay unlawfully high debit-card fees—will have to operate under the fee standard that this Court has found unlawful. *Id.* And Linney's Pizza would be "saddled" with having to seek appropriate relief from this Court to induce prompt further action by the Board. *Id.* Vacatur with a stay can "place limits and reporting requirements on an agency, thus giving 'the agency an incentive to act in a reasonable time'" rather than delay correcting the flaws of Regulation II and force Linney's Pizza to suffer extended harm. *Id.* (quoting *NRDC v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring)).

## CONCLUSION

The Court should grant Linney's Pizza's motion for summary judgment and deny the Board's cross-motion for summary judgment.

Dated: April 9, 2025

Respectfully Submitted,

/s/ Tyler R. Green

Jennifer Kincaid Adams
BLACKBURN DOMENE BURCHETT PLLC
614 W. Main Street, Suite 3000
Louisville, KY 40202
(502) 371-0586
jadams@bdblawky.com

Tyler R. Green (pro hac vice)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir (pro hac vice)
Frank H. Chang (pro hac vice)
Cody Ray Milner (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
frank@consovoymccarthy.com
cody@consovoymccarthy.com

*Counsel for Plaintiff Linney's Pizza, LLC*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: April 9, 2025                                   /s/ Tyler R. Green