**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | |
|---|---|
| LINNEY'S PIZZA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:22-cv-71-GFVT |
| v. | ) |
| | ) |
| BOARD OF GOVERNORS OF | ) |
| THE FEDERAL RESERVE SYSTEM, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE**
**SYSTEM'S REPLY IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................ii

ARGUMENT ........................................................................................................................ 1

I.    The Board Acted Within the Bounds of the Authority Delegated by the Durbin Amendment in Promulgating Regulation II................................................................ 1

    A.    Congress Intentionally Delegated Discretion to the Board.................................... 1

    B.    The Board Acted Within the Bounds of Its Delegated Discretion .......................... 4

        1.    The Statute Permits Inclusion of Costs That Were Neither Expressly Included nor Excluded from Consideration................................................. 4

        2.    The Board Permissibly Included Four Cost Categories That Linney's Pizza Contends are Prohibited ................................................................. 8

            a.    Fixed ACS Costs .................................................................................. 8

            b.    Transactions-Monitoring Costs....................................................... 9

            c.    Fraud Losses ...................................................................................... 10

            d.    Network Processing Fees................................................................. 11

        3.    The Board Permissibly Adopted a Uniform Standard ............................. 13

        4.    The Board's Contemporary and Consistent Interpretation Is Entitled to Respect.................................................................................................... 15

    C.    The Major Questions Doctrine Is Inapplicable..................................................... 16

II.    The Board Did Not Act Arbitrarily or Capriciously ......................................................... 16

    A.    The Board Properly Considered Functional Similarity with Check ..................... 16

    B.    The Board Did Not Act Arbitrarily or Capriciously by Not Defining the Term "Incremental" Costs .......................................................................................... 18

III.    Vacatur Is Not an Appropriate Remedy for Any Procedural Flaw................................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

Page

## Cases

*Air Transport Association of America, Inc. v. USDA*,
    2021 WL 1166928 (D.D.C. Mar. 26, 2021)........................................ 16

*Bailey v. Maine Commission on Government Ethics and Election Practices*,
    900 F. Supp. 2d 75 (D. Me. 2012)................................................. 18

*Bankamerica Corp. v. United States*,
    462 U.S. 122 (1983)................................................................ 14

*Batterton v. Francis*,
    452 U.S. 416 (1977)................................................................. 2

*Brown v. Gardner*,
    513 U.S. 115 (1994)................................................................ 15

*Chamber of Commerce v. SEC*,
    115 F.4th 740 (6th Cir. 2024) ................................................... 19

*Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984)..................................................... 1, 2, 4, 13

*Cleveland-Cliffs Iron Co. v. ICC*,
    664 F.2d 568 (6th Cir. 1981) ...................................................... 2

*Federal Express Corp. v. U.S. Postal Service*,
    151 F.3d 536 (6th Cir. 1998) ...................................................... 7

*General Medicine P.C. v. Azar*,
    963 F.3d 516 (6th Cir. 2020) ...................................................... 7

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) .................................................. 15

*Kentucky v. EPA*,
    123 F.4th 447 (6th Cir. 2024) ................................................... 20

*Loper Bright v. Raimondo*,
    603 U.S. 369 (2024)...................................................... 1, 2, 3, 4, 15

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ................................................................................................ 19

*NACS v. Board of Governors of the Federal Reserve System*,
    958 F. Supp. 2d 85 (D.D.C. 2013) .................................................................... 5, 6

*NACS v. Board of Governors of the Federal Reserve System*,
    746 F.3d 474 (D.C. Cir. 2014) ................................................................... *passim*

*Ohio Environmental Council v. U.S. Forest Service*,
    2023 WL 6370383 (S.D. Ohio Aug. 3, 2023) .................................................. 19

*Pereira v. Sessions*,
    585 U.S. 198 (2018) .............................................................................................. 9

*Pickens v. Hamilton-Ryker IT Solutions LLC*,
    133 F.4th 575 (6th Cir. 2025) .............................................................................. 1

*Pulsifer v. United States*,
    601 U.S. 124 (2024) .............................................................................................. 6

*Safeco Insurance Co. of America v. Burr*,
    551 U.S. 47 (2007) ................................................................................................ 4

*Save Our Cumberland Mountains v. Kempthorne*,
    453 F.3d 334 (6th Cir. 2006) ............................................................................ 18

*Schaffner v. Monsanto Corp.*,
    113 F.4th 364 (3d Cir. 2024) ............................................................................... 3

*Schweiker v. Gray Panthers*,
    453 U.S. 34 (1981) ................................................................................................ 2

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) ..................................................................... 19, 20

*Torres v. Lynch*,
    578 U.S. 452 (2016) .............................................................................................. 6

*United States v. Bedford*,
    914 F.3d 422 (6th Cir. 2019) ............................................................................ 11

*Voss v. Commissioner of Internal Revenue*,
    796 F.3d 1051 (9th Cir. 2015) .......................................................................... 15

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .............................................................................. 16

**Statutes**

1 U.S.C. § 1 ............................................................................................... 13

5 U.S.C. § 553(c) ................................................................................ 19, 20

49 U.S.C. § 10701(a) (1982) ..................................................................... 3

49 U.S.C. § 10701a(c)(1)-(2) (1982) ......................................................... 3

49 U.S.C. § 10701a(c)(4)(B) (1982) ......................................................... 3

49 U.S.C. § 10704(a)(1) (1982) ................................................................. 3

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203,
    124 Stat. 1376, 2082 (codified at 15 U.S.C. § 1693b(e)(2)) ................................................ 3

Electronic Fund Transfer Act of 1978 (as amended),
    15 U.S.C. § 1693*o*-2 ................................................................ *passim*

**Regulations**

12 C.F.R. § 235.4 ..................................................................................... 10

12 C.F.R. § 235.6(a) ................................................................................ 12

12 C.F.R. § 235.6(b) ................................................................................ 12

**Other Authorities**

76 Fed. Reg. 43,394 (July 20, 2011) (Final Rule) .......................... *passim*

80 Fed. Reg. 48,684 (Aug. 14, 2015) (Clarification) .............................. 10

For the reasons below, and those in the Board's opening brief, Linney's Pizza fails to demonstrate that Regulation II is arbitrary, capricious, or contrary to law.

## ARGUMENT

I.     **The Board Acted Within the Bounds of the Authority Delegated by the Durbin Amendment in Promulgating Regulation II**

A.     **Congress Intentionally Delegated Discretion to the Board**

The best reading of the Durbin Amendment is that it delegates substantial discretion to the Board. *See* Board Br. at 12–15. Linney's Pizza's response that "[t]he Board gets no deference in interpreting what the Durbin Amendment means," Resp. at 2, disregards the Supreme Court's recent holding that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion," so that rather than engaging in purely *de novo* review, courts "fix[] the boundaries of [the] delegated authority." *Loper Bright v. Raimondo*, 603 U.S. 369, 394–95 (2024). As the Sixth Circuit recently explained, although *Loper Bright* rejected the *Chevron* presumption that statutory ambiguity implies a delegation of interpretive authority to agencies, it recognized that ordinary tools of statutory construction may indicate that a statute "'delegates discretionary authority to an agency.'" *Pickens v. Hamilton-Ryker IT Solutions LLC*, 133 F.4th 575, 587 (6th Cir. 2025). Thus, a statute may authorize an agency "to give meaning to a particular statutory term" or "'fill up the details' of a statutory scheme." *Loper Bright*, 603 U.S. at 394–95. And such a delegation may define its outer "limits . . . by a term or phrase that 'leaves agencies with flexibility.'" *Id.* at 395.

As the Board explained in its opening brief (at 11-14), the Durbin Amendment indicates in several ways that it broadly delegates such discretion, and the enacting Congress expressly stated that it anticipated that any resulting rule would receive deferential review. First, Congress ordered the Board "to establish standards for assessing whether the amount of any interchange

transaction fee . . . is reasonable and proportional to the cost incurred by the issuer . . . ."

15 U.S.C. § 1693*o*-2(a)(3)(A). As the Board observed, if Congress intended one meaning of

"reasonable" and "proportional" to control, a command for the Board to "establish standards" to

determine whether fees are "reasonable and proportional" would be a nullity. Board Br. at 13;

*see also Batterton v. Francis*, 452 U.S. 416, 428 (1977) ("Congress itself must have appreciated

that the meaning of the statutory term was not self-evident, or it would not have given the

Secretary the power to prescribe standards."). Linney's Pizza does not appear to dispute that the

Durbin Amendment delegates *some* authority; the only dispute is the breadth of this delegation.

    In this regard, the Board explained that both pre-*Chevron* and post-*Loper Bright*

jurisprudence indicates that the Durbin Amendment's language effects a broad delegation. For

example, the "establish standards" provision parallels language that pre-*Chevron* jurisprudence

viewed as granting broad discretion subject to deferential review, holding that the "power to

prescribe standards . . . entrusts to the [agency] . . . primary responsibility for interpret[ation]"

that warrants "more than mere deference or weight." *Batterton*, 432 U.S. at 425–26 (citations

omitted), *cited with approval by Loper Bright*, 603 U.S. at 394–95. Any resulting rule "can be set

aside only if the [agency] exceeded [its] authority or if [it] is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'" *Id.* at 426 (citations omitted); s*ee also

Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (describing the *Batterton* delegation as

"exceptionally broad"). Other pre-*Chevron* decisions, which *Loper Bright* did not purport to

overrule, viewed delegations to set "reasonable" rates as triggering deferential review, giving the

agency discretion about matters such as which variables to consider and whether to use proxies

rather than actual expenses when estimating these variables. Board Br. at 13–14 (citing cases

including *Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568, 580 (6th Cir. 1981)). And post-*Loper

2

*Bright* rulings indicate that language like the Durbin Amendment's delegation to "prescribe regulations . . . to implement this subsection (including related definitions)," 15 U.S.C. § 1693*o*-2(a)(1), "empower[s] the agency to 'fill up the details' of [a] statutory scheme." *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 382 (3d Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 395) (delegation "to prescribe regulations to carry out the provisions" of a statute).

In response, Linney's Pizza claims that the statutes addressed in this jurisprudence lacked "guardrails," while the Durbin Amendment "tells the Board *how to calculate* a 'reasonable' and 'proportional' . . . fee." Br. at 3. But the Durbin Amendment doesn't provide a method of calculation, and this is in any event a false dichotomy. For example, the statute at issue in cases cited in the Board's opening brief authorized agency enforcement of a provision requiring "reasonable" rates, 49 U.S.C. §§ 10701(a), 10704(a)(1) (1982), but beyond this general rule, it also established several relationships between such a rate and various cost items. *E.g.*, *id.* § 10701a(c)(1)-(2) (requiring a minimum reasonable rate defined in part in relation to variable costs), (c)(4)(B) (requiring that the agency shall "determine . . . only those [variable] costs of the specific service in question unless the specific information is not available"). Yet the courts still viewed this statute as implicating deferential review, giving the agency substantial discretion in effecting the statutory mandate, such as by proxying some values with a uniform estimate rather than firm-specific figures. Board Br. at 13–14. So too here. And, as explained below, the Board's exercise of discretion stayed well within the applicable statutory "guardrails."

Lastly, as the Board explained, the enacting Congress expressly provided that a different statutory provision would not "affect[] the deference that a court affords to . . . the Board in making determinations regarding the meaning or interpretation of section 920." Dodd-Frank Act § 1084(3), 124 Stat. 1376, 2082 (codified at 15 U.S.C. § 1693b(e)(2)). This language reflects an

3

intent to grant the Board discretion to give "meaning" to section 920, with its rules receiving deferential review. Linney's Pizza argues that, following *Loper Bright*, "there is no longer any background 'deference.'" Resp. at 4-5. But while *Loper Bright* rejected *Chevron*'s presumption that ambiguity implies a delegation to an agency, it simultaneously recognized that ordinary tools of statutory construction may indicate that the best reading of a statute is that it delegates discretion to the agency. 603 U.S. at 394. Here, the express reference to deference—which Linney's Pizza attempts to treat as a nullity despite Congress's contemporaneous, intentional enactment—is another indication that Congress understood that it was granting the Board broad discretion implicating deferential review. And as noted above, pre-*Chevron* jurisprudence, which the enacting Congress is presumed to have known, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007) (courts "assum[e] that Congress knows how we construe statutes and expects us to run true to form"), indicated that the Durbin Amendment's language granted substantial discretion. No resuscitation of *Chevron* is required to conclude that the Board's Rule, which stayed easily within the bounds set by Congress, was a proper exercise of delegated discretion.

### B.    The Board Acted Within the Bounds of Its Delegated Discretion

#### 1.    The Statute Permits Inclusion of Costs That Were Neither Expressly Included nor Excluded from Consideration

Under ordinary principles of statutory construction, Congress gave the Board discretion to consider, and include, in the interchange fee standard costs that the Board was not expressly precluded from considering by section 920(a)(4)(B)(ii). *See* Board Br. at 14-20; 76 Fed. Reg. 43,394, 43,427. Not only is such discretion apparent from the primary mandate that the Board establish a standard for assessing whether the amount of any fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," 15 U.S.C. §§ 1693*o*-2(a)(2), (a)(3)(A), but also from the text of sections 920(a)(4)(B)(i) and (ii), which use differing language

4

to describe costs the Board must and may not consider. Linney's Pizza's efforts to cabin the Board's discretion to only incremental ACS costs, Resp. at 6-12, are unpersuasive.

As the Board has explained, the non-interlocking language of the included and excluded cost provisions of section 920(a)(4)(B)(i) and (ii), as well as inclusion of the restrictive clause "which are not specific to a particular electronic debit transaction" in the excluded costs provision, which is not set off by commas, make plain that Congress did not intend the included and excluded costs provisions to occupy the entire universe of issuer costs. Those provisions therefore do not preclude the Board from considering costs in addition to incremental ACS costs, provided that they are specific to a particular debit transaction. Board Br. at 17-20; *see also* 76 Fed. Reg. at 43,404, 43,426-27. Linney's Pizza's argument that "the Durbin Amendment bifurcates the universe of costs into two—and only two—categories," Resp. at 6, is contrary to the language and purpose of the Durbin Amendment.

Leaning heavily on the overruled district court opinion in *NACS*, 958 F. Supp. 2d 85, 100-01 (D.D.C. 2013), *rev'd*, 746 F.3d 474 (D.C. Cir. 2014), Linney's Pizza argues "the Board's third [cost] category cannot be squared with the Durbin Amendment's command to 'distinguish between' two cost categories, with 'strategic placement' of 'shall' and 'shall not.'" Resp. at 7. But in reversing the district court, the D.C. Circuit found the statute to be "more easily" read "to qualify the language of section 920(a)(4)(B)(i) so that it encompasses a subset of costs specific to a particular transaction, leaving other costs specific to a particular transaction unmentioned." 746 F.3d at 484. Indeed, under canons of construction regularly invoked by the Supreme Court and Sixth Circuit, use of different language in the included and excluded cost provisions indicates an intent for the two provisions to mean different things. *See* Board Br. at 17. Linney's Pizza glosses over this well-established caselaw, citing two cases for the proposition that "[l]itigants can

5

always posit all manner of ways Congress *could have* crafted a statute differently." Resp. at 8. But neither case involves inclusion of language in one section of a statute and its omission in another, and they carry no force here. *Id*. at 8-9 (citing *Pulsifer v. United States*, 601 U.S. 124, 137-38 (2024) (explaining that Congress could have drafted a criminal sentencing provision more clearly by using "or" rather than "and" in a checklist, but "we doubt that substituting 'or' for 'and' would have delivered us from interpretive controversy")); *see also Torres v. Lynch*, 578 U.S. 452, 460 (2016) (case turning on "well-established background principle distinguishing between substantive and jurisdictional elements in federal criminal statutes"). Rather, as the *NACS* court explained, "had Congress wanted to allow issuers to recover only incremental ACS costs [as Linney's Pizza argues], it could have done so directly." 746 F.3d at 485. But instead,

> in section 920(a)(3)(A) [Congress] required the Board to promulgate regulations ensuring that interchange fees are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction" and separately instructed the Board, when determining issuer costs, to "distinguish between" incremental ACS costs, which the Board must consider, 15 U.S.C. § 1693*o*-2(a)(4)(B)(i), and "other costs . . . which are not specific to a particular electronic debit transaction," which the Board must not consider, *id*. § 1693*o*-2(a)(4)(B)(ii).

*Id.*

Moreover, Linney's Pizza's argument that the Board's reading cannot "be squared with the command to differentiate between incremental ACS costs and 'other' costs, which 'was intended to subsume *all* costs not explicitly addressed in the first, permissible category of costs,'" Resp. at 7 (quoting overruled *NACS*, 958 F. Supp. 2d at 101), entirely ignores that "other costs incurred by an issuer" in section 920(a)(4)(B)(ii) is modified by the restrictive "which" clause that is not set off by commas. *See* Board Br. at 19-20. As the Board explained, Linney's Pizza's reading of "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" to mean simply "other costs" renders *most* of the language of section 920(a)(4)(B)(ii) a nullity, ignores its punctuation, and is barely defensible much less the

6

best construction. Board Br. at 19-20 (citing authorities); *NACS*, 746 F.3d at 487 ("the absence of commas matters"); *Gen. Med. P.C. v. Azar*, 963 F.3d 516, 521 (6th Cir. 2020) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (internal quotations omitted)). Linney's Pizza speculates that Congress may have elected not to follow a "convention" of "grammarians." Resp. at 10. But, as the *NACS* court held, "in the Durbin Amendment Congress set aside *every* clearly descriptive clause with commas," and "[f]ollowing the merchants' advice and stuffing punctuation to the bottom of the interpretive toolbox would run the risk of distorting the meaning" of the statute. 746 F.3d at 486-87 (emphasis added).[1]

While conceding that the Durbin Amendment's "purpose was to reduce the amount of an issuer's interchange fee to a 'reasonable and proportional' amount," Resp. at 7, Linney's Pizza ignores that the Final Rule reduced interchange fees to approximately half their pre-Rule levels. *See* Board Br. at 2, 14. Linney's Pizza's argument also ignores that any determination that *only* incremental ACS costs could be included in the interchange fee standard would have prevented the Board from considering and including other issuer costs that are specific to particular debit transactions, contrary to the statute's text and mandate of reasonableness and proportionality. *Id*. at 15-16. Applying all the tools of statutory construction, the Board's construction is the best.

---

[1] Linney's Pizza's claim that the Board's reading of the "which" clause "would mean that every non-restrictive clause in the U.S. Code is surplusage," Resp. at 11 n.2, is a vast overstatement and its related arguments are unsupported by the citations. For example, *Fed. Express Corp. v. U.S. Postal Serv.*, 151 F.3d 536, 543 (6th Cir. 1998), held that "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." Here, there *are* "positive repugnancies" with Linney's Pizza's construction, which contradicts the language and punctuation of section 920(a)(4)(B)(ii). *See* Board Br. at 17-20. Moreover, Linney's Pizza seeks to nullify *most* of the language of section 920(a)(4)(B)(ii) as enacted by Congress. And, contrary to its conclusory assertion, the Board's reading gives effect to all of the statutory terms and renders no language surplusage.

### 2.    The Board Permissibly Included Four Cost Categories That Linney's Pizza Contends are Prohibited

#### a.    Fixed ACS Costs

The Board properly considered, and included, fixed and variable authorization, clearance, and settlement ("ACS") costs incurred in effecting specific debit transactions. *See* Board Br. at 20-21. As the Board explained, "no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit transaction," 76 Fed. Reg. at 43,427, and thus not excluded by section 920(a)(4)(B)(ii). Linney's Pizza responds that "[i]t's a stretch to argue that the fixed ACS costs are 'specific' to a 'particular' debit-card transaction," comparing them to rent payments. Resp. at 13. But the Board excluded "[c]orporate overhead costs incurred by an issuer for its general business operations [that] are shared across all product lines of the issuer and are not specific to a particular electronic debit transaction," because while "these costs may in some way be related to debit card programs and transactions [they] are not specific to a particular electronic debit transaction within the meaning of the prohibition in section 920(a)(4)(B)(ii) and therefore may not be considered." 76 Fed. Reg. at 43,427; *see also id*. at 43,428 (overhead includes "costs to operate the issuer's branch network").

Linney's Pizza further argues that the statute's bar on "costs that are 'not specific to a particular electronic debit transaction,'" includes fixed ACS costs. Resp. at 13 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii)). But the statute does not use the terms "fixed" or "variable," nor does it require exclusion of fixed ACS costs, because "[u]nder the . . . statute, all costs related to a particular transaction may be considered, and some—the incremental costs incurred by the issuer for its role in authorization, clearance, and settlement—must be . . . ." 76 Fed. Reg. at 43,427. Both fixed and variable ACS costs are inherently specific to particular debit transactions since "[e]ach transaction uses the equipment, hardware, software and associated labor, and

8

[because] no particular transaction can occur without incurring these costs." *Id*. at 43,430. And as the Board noted, any attempt to pigeonhole a separate category of fixed ACS costs is "difficult to apply in practice" and depends on a variety of factors including the relevant time horizon and the structure of an issuer's operations. 76 Fed. Reg. at 43,427. Indeed, "the same type of cost may appear variable in one year, but fixed in a different year," and "a distinction between fixed and variable costs" could render "enforcement . . . uneven." *Id.*; *accord NACS*, 746 F.3d at 489-90. Linney's Pizza's citation to *Pereira v. Sessions*, 585 U.S. 198, 217 (2018), to argue that "practical considerations . . . do not justify departure from the statute's clear text," Resp. at 13, does not aid its case. As explained in the Board's opening brief (at 20-21) and the Final Rule, 76 Fed. Reg. at 43,427, the Board hewed to the statutory text in including fixed *and* variable ACS costs.

### b.    Transactions-Monitoring Costs

The Board also properly considered and included transactions-monitoring costs, which are "integral to transaction authorization." 76 Fed. Reg. at 43,430; *see also* Board Br. at 22-23. Transactions-monitoring systems such as neural networks and fraud-risk scoring "assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction." 76 Fed. Reg. at 43,430. As such, transactions-monitoring "is as integral to the authorization decision as confirming that a card is valid and authenticating the cardholder," *id*., and was correctly considered as a cost specific to the decision to authorize, or decline, a particular debit transaction. Board Br. at 22-23. Linney's Pizza concedes that transactions-monitoring "may '*assist* in the authorization process,'" and "'may even be '*integral to* the authorization decision,'" Resp. at 14 (citation omitted), but insists the Board "never *equated* transaction monitoring to authorization." *Id*. This is a distinction without a difference. Linney's Pizza cannot reasonably dispute, as explained in the Final Rule, 76 Fed. Reg. at 43,430,

that various safeguards, such as transactions-monitoring, factor into the authorization decision and were properly included. As the Board noted, "[b]ecause [section 920(a)(4)(B)(i)] requires . . . consider[ation of] incremental authorization costs in setting the interchange fee standard, the Board . . . should consider the costs of all activities that are integral to authorization"—such as transaction monitoring—"even if those costs are also incurred for the dual purpose of helping to prevent fraud." Clarification, 80 Fed. Reg. 48,684, 48,685.

Unable to show that the Board was barred from including transactions-monitoring costs in the fee standard, Linney's Pizza falls back on its mantra that these costs could only be included in the separate provision for fraud prevention costs in section 920(a)(5)(A)(i)-(ii). Resp. at 14-15. But as the Board explained, unlike transactions-monitoring costs that are inextricably linked to authorization of particular debit transactions and thus correctly included in the base interchange fee standard, omission of "particular" in section 920(a)(5)(A)(i) and use of the more general "in relation to" and the plural "electronic debit transactions" indicates that the separate adjustment for fraud prevention may account for an issuer's fraud prevention costs over a broad spectrum of transactions not linked to authorization of a particular debit transaction. Board Br. at 22-23; *see also* Clarification, 80 Fed. Reg. at 48,685. Far from "render[ing] ineffective" the separate fraud prevention adjustment, Resp. at 14, the costs considered in that separate rule (published at 12 C.F.R. § 235.4) are "programmatic costs, such as researching and developing new fraud prevention technologies . . . , and other costs that encourage enhanced fraud prevention that are not necessary to effect particular transactions." 80 Fed. Reg. at 48,686.

### c.    Fraud Losses

Linney's Pizza's claim that the Board improperly included part of an issuer's fraud losses as the *ad valorem* (percentage of a transaction's value) component fails for similar reasons. Resp.

10

at 15-16. As the Board explained, fraud losses are clearly "specific to a particular transaction" because they generally result from "authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent." 76 Fed. Reg. at 43,431; *see* Board Br. at 24-25. Linney's Pizza quibbles with the Board's use of a dictionary definition of "cost" as a "loss or penalty involved in gaining something." Resp. at 15; *see* Board Br. at 24. But contrary to Linney's Pizza's claim that a fraud loss cannot be a "cost," the Board showed that fraud losses logically fit in that category. Board Br. at 24-25; *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) ("[i]n discerning . . . plain meaning . . . this court may look to a dictionary"). Not only are they incurred by the issuer due to ACS of a particular transaction that later turns out to be fraudulent, but they are quintessentially specific to a particular transaction and were properly considered and included. *See* 76 Fed. Reg. at 43,431.

Linney's Pizza's additional argument that including fraud losses was improper because they are anticipatory payments charged "regardless of whether a fraud loss occurs," Resp. at 16, is a red herring. Interchange fee rates are established by a network in advance of any transaction and well before the cost of a particular transaction is known. *See* Board Br. at 25. Moreover, looking to the costs of past transactions in establishing interchange fee standards is entirely appropriate and fully consistent with the language of the Durbin Amendment. *Id.* at 25. Finally, as the D.C. Circuit observed in *NACS*, "fraud losses result from the *failure* of fraud-prevention," and nothing about the text or structure of the Durbin Amendment demands that they be included in the separate fraud-prevention adjustment rather than in the interchange fee. 746 F.3d at 491.

### d.    Network Processing Fees

Lastly, the Board properly included network processing fees (switch fees) paid by the issuer to a network, which vary with the number of transactions processed, are "incurred for the

11

issuer's role in [ACS]," and are specific to a particular electronic debit transaction. 76 Fed. Reg. at 43,430; *see* Board Br. at 25-26. Linney's Pizza suggests that because network processing fees are compensation for the *network's* role in a transaction, they are not incurred "for the role of the issuer" in ACS. Resp. at 16-17 (citing 15 U.S.C. § 1693*o*—2(a)(4)(B)(i)). But these fees are paid by issuers to the network for each transaction, and thus are necessarily incurred "for the role of the issuer" because, but for being an issuer, it would not incur these fees. Board Br. at 25-26.

Linney's Pizza cites the *NACS* decision for the proposition that network processing fees "are paid by 'both the issuer and the acquirer' alike for the network's role in the transaction." Resp. at 16-17 (quoting *NACS*, 746 F.3d at 479). But that background portion of the decision was a general list of "various fees" that "the parties [to a debit card transaction] charge each other." 746 F.3d at 478-79. In expressly upholding the Board's inclusion of network processing fees, "which issuers pay on a per-transaction basis," in the fee standard, the court found that these fees are *obviously* specific to particular transactions." *Id*. (emphasis added). The court also rejected the NACS merchants' argument—similar to Linney's Pizza's, *see* Resp. at 17—that inclusion of network processing fees runs afoul of the separate provision in section 920(a)(8) that permits the Board to prescribe rules to ensure that "network fees" are not used to "directly or indirectly compensate an issuer" or "circumvent or evade the restrictions of this subsection." 15 U.S.C. § 1693*o*-2(a)(8)(B). As the court of appeals concluded, "the merchants should have left [this argument] out entirely," *NACS*, 746 F.3d at 491, because this separate provision, which the Board implemented at 12 C.F.R. §§ 235.6(a) and (b), is distinct from the interchange fee standard. In particular, the fees or other amounts "received by an issuer from a payment card network," *id*. § 235.6(b), which are the subject in part of section 920(a)(8), are different from network processing fees an issuer pays to a network as part of ACS. *See, e.g.*, 76 Fed. Reg. at 43,430.

Contrary to Linney's Pizza's claim, nothing in section 920(a)(8), or elsewhere, bars the Board from taking network processing fees into account in setting the interchange fee standard.

### 3.    The Board Permissibly Adopted a Uniform Standard

Linney's Pizza contends that the Board was required to set fees that are "transaction-specific" (where the fee for processing a specific transaction matches the costs associated with that transaction and thus varies by transaction), rather than a single fee based on a "representative transaction" and a "representative issuer." Resp. at 19. As the Board noted in its opening brief (at 27-28), it explained during the rulemaking that such an approach was "virtually impossible" to implement since, *inter alia*, information needed to calculate the exact cost of a transaction only becomes available *after* the transaction and associated fee is processed. 76 Fed. Reg. at 43,422.[2] The absurdity canon therefore compelled a different reading of the statute, which is not barred by the statute's references to "the" transaction and "a particular" transaction. Board Br. at 28-29 (citing sources indicating that "the" and "a" can refer to "any" or "typical" instances of a noun, as well as the express presumption in 1 U.S.C. § 1 and related jurisprudence that references to the singular can also refer to the plural).[3] The Board also noted that courts presume (without resort to *Chevron*) that delegations that may require line-drawing necessarily imply relatively broad discretion on how to engage in this fact-bound exercise, and it therefore appropriately adopted a standard based on a "representative" transaction and issuer. *Id.* at 30 (citing cases).

---

[2] Although the Board received over 11,500 comments during the rulemaking process, even those commenters who sought a more granular approach generally argued for aggregation at the issuer level rather than arguing that a fee that varies at the transaction-by-transaction level would be feasible and should be adopted. 76 Fed. Reg. at 43,423; Board Br. at 28.

[3] Contrary to Linney's Pizza's assertions, Resp. at 19 n.4, the Board did not center its argument on the use of the indefinite article; rather, the Board noted, *inter alia*, that the *definite article* can be used in a representative context, and more importantly, that any other construction would lead to an absurd result by requiring a standard that would be impossible to implement.

Linney's Pizza fails to directly address this rationale. It argues that the absurdity canon is inapplicable if implementing a "transaction-specific fee standard would be difficult," Resp. at 19, but does not rebut the Board's explanation that doing so would be "practically impossible," not just difficult. It cites legislative history and statutory authorization for the Board to collect data on issuer costs, Resp. at 20-21, but neither the legal authority to collect data nor any amount of legislative history can solve the problem noted during the rulemaking concerning the *nonexistence* of real-time data needed to set fees for transactions as they occur. Linney's Pizza thus blames the Board for not adopting a fee standard that could not have been implemented. As the authorities it cites explain, such a construction that is "preposterous, one that 'no reasonable person could intend,'" is precisely one that the absurdity canon precludes. Resp. at 20 (citations omitted).

Moreover, because the statutory language Linney's Pizza relies on refers to "transaction" and "issuer" in the same sentence, and applies equally to both, the Board logically found that if it cannot be read to require a transaction-specific standard, it also cannot require an issuer-specific standard. 76 Fed. Reg. at 43,423; *accord Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983) ("[W]e reject as unreasonable the contention that Congress intended [a] phrase . . . to mean one thing when applied to 'banks' and another thing as applied to 'common carriers,' where the phrase . . . modifies both words in the same clause."). In any event, Linney's Pizza insists that it does not contend the Board could adopt an issuer-specific standard without also adopting a transaction-specific standard. Resp. at 19. As explained above, the statutory language Linney's Pizza cites can be read to indicate a representative transaction and issuer, and courts presume that delegations to agencies that implicate fact-bound line-drawing decisions generally grant broad discretion in making these determinations. The Board therefore acted well within the

bounds of its authority in setting a fee standard based on a representative transaction and issuer.

**4.    The Board's Contemporary and Consistent Interpretation Is Entitled to Respect**

Apart from the fact that the Durbin Amendment expressly delegated broad "discretion," *Loper Bright*, 603 U.S. at 395, Regulation II was adopted "roughly contemporaneously with the statute's enactment" and is therefore entitled to "very great respect," particularly because it has "remained consistent over time." *See* Board Br. at 31 (quoting *id*. at 385-86). Linney's Pizza fails to show otherwise. It cites cases about interpretations that were "contrary to" or showed "clear inconsistency with a statute," Resp. at 5-6, but, as the D.C. Circuit explained, "nothing in the statute's language compel[s] th[e] result" for which Linney's Pizza argues. *NACS*, 746 F.3d at 484. For similar reasons, Linney's Pizza's reliance on *Brown v. Gardner*, 513 U.S. 115 (1994), which dismissed an agency interpretation that "flies against the plain language of the statutory text" but had "aged nicely" due to procedural bars to review, *id.* at 122, is misplaced. Linney's Pizza also makes the illogical assertion that a "single [regulation]" (which reflects *consistency*) is undeserving of respect, Resp. at 5 (citation omitted), based on cases that are not on point because, *inter alia*, they *did not involve regulations*, much less consistent interpretations since the time of enactment. One involved a "single executive order" issued 64 years post-enactment that was only "remotely" relevant to the issue in litigation. *Georgia v. President of the United States*, 46 F.4th 1283, 1301 (11th Cir. 2022). In another, the court deemed a conclusory assertion in agency counsel's six-year-old memo "closer to a 'mere[] . . . litigating position,'" contrasting it with a persuasive construction that—like Regulation II—reflects a "consistent position for over a decade." *Voss v. Comm'r*, 796 F.3d 1051, 1066 (9th Cir. 2015). This latter case undermines Linney's Pizza's insinuation that only interpretations "in place for decades" are persuasive, Resp. at 5, which was dicta in a case whose *holding* was that no respect was due after the agency flip-

flopped multiple times. *Air Transp. Ass'n of Am., Inc. v. USDA*, 2021 WL 1166928, at *13 (D.D.C. Mar. 26, 2021). In contrast, Regulation II is an agency interpretation contemporaneous with the statute's enactment that has remained consistent and is thus entitled to "great respect."

### C.     The Major Questions Doctrine Is Inapplicable

The Board explained that, contrary to Linney's Pizza's assertion, Regulation II does not implicate the major questions doctrine because the Board did not make an "unheralded" claim that a "rarely . . . used" law gave it previously unasserted and "transformative" power. Board Br. at 31 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721, 723-24 (2022)). Instead, the Rule reflects the Board's position since enactment, and Linney's Pizza asserts the Board is *underregulating* rather than wielding excessive regulatory power. Linney's Pizza's only response, quoting *West Virginia*, that Regulation II concerns a "question of 'economic and political significance,'" Resp. at 11 (citation omitted),[4] proves too much. In *West Virginia*, the "significant" question concerned an agency's claim of authority to "substantially restructure [a] market." 597 U.S. at 729–30. In contrast, Linney's Pizza is complaining that the Board *did not sufficiently* "restructure" the debit card payment processing market, and seeks to *compel* agency action with *greater* economic impact. Its attempt to argue that requiring *additional* fee reductions beyond what Regulation II already requires would not be a "greater assertion of regulatory power," Resp. at 12, defies logic. The major questions doctrine is simply inapplicable.

## II.     The Board Did Not Act Arbitrarily or Capriciously

### A.     The Board Properly Considered Functional Similarity with Check

The Board showed that it considered "the functional similarity between" electronic debit transactions and checking transactions as required by section 920(a)(4)(A). Board Br. at 33-34.

---

[4] Linney's Pizza claims that the Board does not contest "significan[ce]," *id.* at 11, but the Board distinguished Regulation II from "transformative" rules triggering the doctrine. Board Br. at 31.

Not only did the Board analyze overall similarities with, and differences between, debit and checking transactions, 76 Fed. Reg. at 43,398-401, but it considered such similarities and differences, along with section 920(a)(4)(B) cost considerations, in deciding to include or exclude specific items of cost. Board Br. at 33-34. Linney's Pizza argues that "the Board did not adequately consider" functional similarity between debit and checking, "including when the Board decided to include the four nonstatutory costs," Resp. at 23, but Linney's Pizza gives no indication of what it considers "adequate," and the Board thoroughly analyzed the similarities and differences between the two systems. 76 Fed. Reg. at 43,398-401; *see also id.* at 43,428-30. Linney's Pizza confusingly argues that the Board "doesn't explain why network-processing fee[s] should still be included" in the interchange fee standard because the Board noted that, "in 'electronic check collection systems, both the payee's bank and the payor's bank generally pay processing fees.'" Resp. at 23. But the Board explained that, "[t]o the extent that acquirers and merchants may be in the position of directly paying all of their network fees as well as [those] of covered issuers through interchange fees," this arrangement is similar to "traditional paper-check processing where the payee's bank (the corollary to the acquirer for the merchant) typically pays all processing costs." 76 Fed. Reg. at 43,430. Linney's Pizza also loses sight of the fact that, besides considering functional similarity with check, the Board *also* had to take into account section 920(a)(4)(B) cost considerations *and* sections 920(a)(2)'s and (a)(3)(A)'s overall mandate of reasonableness and proportionality in promulgating the interchange fee standard. Thus, there is no showing that the Board acted arbitrarily or capriciously or failed to consider an important aspect of the problem with regard to functional similarity to check. *See* Board Br. at 33-34.

**B.    The Board Did Not Act Arbitrarily or Capriciously by Not Defining the Term "Incremental" Costs**

The Board did not err by not defining the term "incremental" as used in 920(a)(4)(B)(i). Resp. at 24-25. "Agencies are not required to promulgate rules defining every statutory term that might be called into question." *Bailey v. Maine Comm'n on Gov't Ethics*, 900 F. Supp. 2d 75, 90 (D. Me. 2012) (internal quotation omitted). The Board carefully considered the issue, but decided that such a definition was neither practical nor necessary to effect the statutory mandate because it considered and included all incremental ACS costs as directed by Congress and because "there is no single generally-accepted definition of the 'incremental cost' of a particular unit of a service." 76 Fed. Reg. at 43,426. While some commenters urged a definition of incremental as "differentiating between 'fixed' and 'variable' costs," the Board explained that this is problematic because "the same type of cost may appear variable in one year, but fixed in a different year," issuers' cost accounting systems are "generally not set up to differentiate between fixed and variable costs," which "could result in significant variation across issuers as to which costs are allowable and which are not," and some issuers outsource their debit card operations. *Id.* at 43,427. Moreover, the Board ultimately and correctly determined that it was unnecessary to define "incremental" because, by "considering all costs for which it had data other than prohibited costs, the Board has complied with the statutory mandate not to consider costs identified in Section 920(a)(4)(B)(ii), [and] has fulfilled the statutory mandate requiring consideration" of incremental ACS costs in section 920(a)(4)(B)(i). *Id.*

Thus, it is apparent that Linney's Pizza has not met *its burden* to show that the Board's action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *E.g.*, *Save Our Cumberland Mts. v. Kempthorne*, 453 F.3d 334, 347 (6th Cir. 2006) (affirming district court's determination that agency did not act arbitrarily or capriciously where "plaintiffs

18

have not identified a single alternative that the agency should have considered but did not" ). Rather, the Board relied on the factors Congress intended, considered all important aspects of the problem, articulated a satisfactory explanation, and otherwise acted in accordance with the APA in promulgating the Final Rule. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Chamber of Commerce v. SEC*, 115 F.4th 740, 750 (6th Cir. 2024).

**III.    Vacatur Is Not an Appropriate Remedy for Any Procedural Flaw**

Should the Court rule for Linney's Pizza on procedural grounds concerning the adequacy of the Board's explanation or comparison to check transactions (*i.e.*, with respect to the preamble rather than the contents of the rule itself), the Court should exercise its discretion to remand without vacatur. Board Br. at 35-36. As the Board explained, "[t]he Sixth Circuit has recently held that 'whether vacatur is appropriate [in an APA action] depends on the seriousness of the agency error and the disruptive consequences of vacatur.'" *Id.* at 35 (quoting *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023)) (cleaned up). The Board further explained that, because it could remedy any of the purported procedural flaws without devising new regulations simply by issuing a supplemental statement as it did after *NACS*, "the overall equities and practicality of the alternatives" favor remand without vacatur. *Sierra Club*, 60 F.4th at 1022; *see also Chamber of Commerce*, 115 F.4th at 750 (a court "should vacate a challenged regulation [under the APA] only if it had no rational basis or . . . it involved a clear and prejudicial violation of applicable statutes or regulations" (cleaned up)); *Ohio Env. Council v. U.S. Forest Serv.*, 2023 WL 6370383, at *2 (S.D. Ohio Aug. 3, 2023) ("vacatur is not a mandatory remedy [under the APA]; instead courts have the discretion to fashion an appropriate remedy as equity requires"). In contrast, vacatur would result in unnecessary delay and diversion of public resources, since a new notice-and-comment rulemaking would be required to replace the vacated Rule, 5 U.S.C.

19

§ 553(c), while any alleged problems with the *preamble* that may not implicate the contents of the Rule might be cured with a sufficient explanation, as the Board did with the Clarification.

In response, Linney's Pizza cites rulings that *chose* not to remand without vacatur, as well as dicta and concurrences criticizing the practice, Resp. at 25-26, but cites no precedent barring courts from remanding without vacatur.[5] Linney's Pizza also claims remand without vacatur is inappropriate if the Court finds the Board "set a calculated rate by relying on factors it should not have relied on." *Id.* at 27. But as Linney's Pizza acknowledged, the Board has not argued for remand without vacatur should the Court find that the Board set a fee based on costs prohibited by statute. *Id.* at 25. The Board only argued for remand without vacatur in the (equally unlikely) event the Court should find any procedural flaw, in which case a sufficient explanation on remand may allow the Rule to remain in place and thus result "in the same outcome." *Id.* at 27. Contrary to Linney's Pizza's claim that this is a "rare" and "exceptional" remedy, *id.* at 26, "remand without vacatur is warranted '[w]hen an agency may be able readily to cure a defect in its explanation of a decision' and the 'disruptive effect of vacatur' is high," as the D.C. Circuit explained in *NACS*, 746 F.3d at 493. And while Linney's Pizza frets that lack of vacatur will give the Board no incentive to act quickly, Resp. at 27, it does not explain why such an incentive to delay is any likelier to occur than it would with the stay it seeks, or how an entirely new notice and comment rulemaking could take less time than issuing an amended preamble.

## CONCLUSION

The Court should grant the Board's motion for summary judgment.

---

[5] Linney's Pizza's reliance on *Kentucky v. EPA*, 123 F.4th 447, 473 (6th Cir. 2024), is misplaced. Resp. at 26. There, the court acknowledged *Sierra Club* and cases permitting remand without vacatur, but held that this remedy is not appropriate "[i]f . . . the agency committed a 'fundamental' error—such as taking a substantively illegal action or ignoring notice-and-comment requirements." *Kentucky*, 123 F.4th at 472. Neither occurred here. Board Br. at 32-36.

Dated: April 30, 2025

Respectfully submitted,

 /s/  Joshua P. Chadwick
Joshua P. Chadwick
   Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
   Senior Counsels
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for the Board of Governors of the Federal Reserve System*