UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| LINNEY'S PIZZA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:22-cv-00071-GFVT |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| BOARD OF GOVERNORS OF THE | ) | **&** |
| FEDERAL RESERVE SYSTEM, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

Fees. One of the many joys of modern life. In this case, debit card fees. Before the Court are Cross Motions for Summary Judgment by Linney's Pizza [R. 39] and the Board of Governors of the Federal Reserve. [R. 46.] Linney's Pizza challenges the Board's regulation setting a debit-card fee standard as inconsistent with the authorizing statute and asks that such regulation be set aside. Boiling the dispute down to the basics, Linney's Pizza thinks the Board's rule includes improper costs in its calculation, resulting in too high a fee cap and thus more fees paid by retailers like Linney's Pizza. But because the Board's regulation is not contrary to law—nor is it arbitrary and capricious—the Board's Motion for Summary Judgment **[R. 46]** is **GRANTED** and Linney's Pizza's Motion for Summary Judgment **[R. 39]** is **DENIED.**

**I**

**A**

Debit cards are nearly ubiquitous these days, much to the chagrin of those who prefer cold, hard cash. They allow consumers to directly access funds in their accounts and easily transfer those funds to vendors in return for goods and services. But as simple as using debit

cards can be, the behind-the-scenes reality is much more complex.  Each debit card transaction involves four players: the consumer who uses a debit card to pay for goods and services; the issuer bank that issues the debit card (the consumer's bank); the acquirer that receives the money (the merchant's bank); and the networks (such as Visa or Mastercard) who provide the infrastructure, software, and services necessary to move money from one bank to another.

The transaction itself entails three steps: authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's value," and is followed by checks concerning the sufficiency of funds and whether the transaction appears fraudulent.  *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 478 (D.C. Cir. 2014) ("*NACS II*").  Clearance is "a formal request for payment sent from the merchant on the network to the issuer" and settlement "involves the actual transfer of funds from the issuer to the acquirer," after which "the transaction has concluded."  *Id.*  Typically, PIN debit transactions are authorized and cleared simultaneously, while signature debit transactions require separate clearance.  *Id.*  The delay for signature transactions is effectively what allows some businesses—such as restaurants or hotels—to account for additional expenses like room service or a tip.  *Id.*

And, of course, there are fees.  Relevant here is the interchange-fee, which issuers charge acquirers to compensate the issuer for its role in the transaction.  *Id.* at 479.  Other fees include "network processing fees," which compensate the networks, and "merchant discount" fees, which compensate the acquirer and pass along the other fees.  At the bottom of this fee funnel is the merchant (and arguably the consumer) who pays all the passed along fees and markups.  *Id.* Debit cards and their associated fees are big business, with over a trillion dollars a year in

transactions occurring via debit card.  Prior to 2010 the interchange-fee market was entirely

unregulated.  In 2009 the average interchange fee for all debit-card transactions reached as high

as 44 cents per transaction.  At the same time, costs for these transactions ranged from between 8

to 13 cents—leaving room for a very large profit margin indeed.

**B**

Consequently, Congress set out, as part of the Dodd-Frank Wall Street Reform and

Consumer Protection Act of 2010, to alter this status quo.  The so called "Durbin Amendment,"

named after its sponsor Illinois Senator Richard Durbin, altered the Electronic Funds Transfer

Act to restrict the amount of the interchange fee and address growing problems in the industry.

*See* Pub.L. No. 111–203, 124 Stat. 1376 (2010); *see also* Pub.L. No. 95–630, 92 Stat. 3641

(1978).  Codified at 15 U.S.C. § 1693*o*–2, the Durbin Amendment – which exempts some

smaller banks – instructs the Board of Governors of the Federal Reserve System to promulgate

regulations ensuring that "the amount of any interchange transaction fee ... is reasonable and

proportional to the cost incurred by the issuer with respect to the transaction."   15 U.S.C. §

1693*o*–2(a)(3)(A).

In implementing this command, the statute directs the Board to "consider the functional

similarity between…electronic debit transactions and checking transactions that are required

within the Federal Reserve bank system to clear at par." 15 U.S.C. § 1693*o*–2(a)(4)(A).  It also

directs the Board to "distinguish between…the incremental cost incurred by an issuer for the role

of the issuer in the authorization, clearance, or settlement of a particular electronic debit

transaction, which cost shall be considered under paragraph (2)… and other costs incurred by

an issuer which are not specific to a particular electronic debit transaction, which costs shall not

be considered under paragraph (2)." 15 U.S.C. § 1693*o*–2(a)(4)(B).  The statute also allows for

3

"an adjustment to the fee amount received or charged by an issuer under paragraph (2)" if "such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer" and the issuer complies with "fraud-related standards established by the Board."  15 U.S.C. § 1693*o*–2(a)(5)(A).

Tasked with implementing the statute, the Board initially floated a proposed rule which outlined two possible ways to implement the "reasonable and proportional" requirement. Proposed Rule, 75 Fed. Reg. 81,722 (Dec. 28, 2010).  The first alternative allowed an issuer to receive a per-transaction interchange fee up to a 7-cent safe harbor, with an adjustment up to a 12-cent-per-transaction cap if the issuer had costs higher than 7 cents and could prove it.  *Id.* at 81,736-38.  The second alternative simply entailed a universal 12-cent cap.  *Id.*  The proposed rule received thousands of comments and on July 20, 2011 (effective October 1, 2011) the Board promulgated the Final Rule, which is now at issue in this case.  *See* Regulation II, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011)

Yet Regulation II differed from the proposed rule in a big way—the interchange fee cap was now 21 cents per transaction with a 0.05% *ad valorem* (based on the value of the transaction) adjustment.  *Id.* at 43,420.  The Board reached this conclusion by determining that while § 1693*o*–2(a)(4)(B)(i) requires it to consider incremental ACS costs incurred by issuers, and § 1693*o*–2(a)(4)(B)(ii) prohibits consideration of any issuer costs that are not specific to a particular transaction, the statute is silent with respect to costs that fall into neither category. Regulation II, 76 Fed. Reg. at 43,426.  The Board thereafter considered a number of costs in setting the fee standard, including: (1) fixed costs related to processing a particular transaction, such as network connectivity and software, hardware, equipment, and labor; (2) transaction

4

monitoring costs; (3) an allowance for fraud losses (the *ad valorem* component); and (4) network processing fees. *Id.* at 43,404, 43,429-31.

C

All change can invite frustration and so too can it invite litigation. Many of the issues in this case have in fact been previously litigated, first in the U.S. District Court for the District of Columbia and then in the U.S. Court of Appeals for the D.C. Circuit. *See NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85 (D.D.C. 2013) ("*NACS I*"); *see also NACS II*, 746 F.3d 474 (D.C. Cir. 2014). Applying *Chevron*'s step one, the District Court determined that the statute unambiguously precluded the costs relied upon by the Board and vacated the rule. *NACS I*, 958 F. Supp. 2d at 99-109. The D.C. Circuit reversed, reasoning that the statute was ambiguous under *Chevron*'s first step and that the Board's interpretation was reasonable under the second. *NACS II*, 746 F.3d at 483-93. However, the court in *NACS II* did remand one issue to the Board, requiring it "to articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment." *Id.* at 492-93. The Board thereafter issued an updated rule which provided additional explanations for why it included the transaction-monitoring costs in the fee standard. Updated Rule, 80 Fed. Reg. 48,684 (Aug. 14, 2015).

The issue lay dormant for years before new challengers appeared. Linney's Pizza brought this suit in December 2022. This Court thereafter granted the Board's motion to dismiss Linney's Pizza's complaint as untimely, as Linney's Pizza's injury had occurred after the APA's six-year statute of limitations had expired. [R. 17.] Linney's Pizza appealed that decision, [R. 18], and while that appeal was pending the Supreme Court decided *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024). In *Corner Post*, which on the merits itself

5

entails another challenge to Regulation II, the Supreme Court clarified that an APA claim does not accrue until the plaintiff is injured by the final agency action.  *Id.*  In light of that decision, the parties jointly moved to vacate and remand this Court's dismissal order, and the case was returned to this Court.  [R. 21.]  The parties have now cross moved for summary judgment and several *amici* have submitted briefing in support of one side or the other.[1]  The Court notes that the District Court in *Corner Post* has now determined that Regulation II exceeded the Board's authority by including a third category of costs, by including four additional costs prohibited by the statutory text, and by adopting a single fee standard for all issuers.  *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, No. 1:21-cv-00095 (D.N.D. Aug. 6, 2025).  Consequently, the District Court there vacated the rule at issue in this case, but stayed its decision pending appeal to the Eight Circuit.  *Id.*

## II

Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  However, in cases brought pursuant to the Administrative Procedure Act the "usual rules governing summary judgment do not apply."  *Integrity Gymnastics & Pure Power Cheerleading, LLC v. U.S. Citizenship and Immigr. Servs.*, 131 F. Supp. 3d 721, 725 (S.D. Ohio 2015) (citing *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)).  Frequently this is because "the entire case on review is a question of law."  *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D. N.Y. 2012) (internal quotation

---

[1] Those amici are: Retail Litigation Center, Inc., National Federation of Independent Business Small Business Legal Center, Inc., and Merchant Advisory Group [R. 42]; the American Bankers Association [R. 59]; the Bank Policy Institute and the Clearing House Association, LLC [R. 57.]

marks and citation omitted); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).  Such is the case here, with the parties noting that they "do not believe that the administrative record is needed to resolve [Linney's Pizza's] claims," presumably because those claims solely turn on the proper interpretation of the Durbin Amendment and its implementation via Regulation II.  [R. 23; R. 39; R. 46]

Under the APA, the Court must set aside agency action that exceeds the agency's "statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).  It must do the same if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  When resolving "a pure question of law" the Court "must review… the agency's… interpretation of [statutory] terms without giving it deference*." Kentucky v. EPA*, 123 F.4th 447, 467 (6th Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024)).

Linney's Pizza raises a number of challenges to Regulation II and the Board's interpretation of the Durbin Amendment.  First, Linney's Pizza suggests three reasons Regulation II is "contrary to law": (1) it impermissibly creates a third category of costs which can be included in the interchange-fee standard; (2) it includes four kinds of prohibited costs in the fee standard; and (3) it sets a "one-size-fits-all cap" when the statute requires the fee standard to be transaction- and issuer- specific.  [R. 39-1 at 21-38.]  Linney's Pizza then suggests three reasons Regulation II is "arbitrary and capricious": (1) the Board failed to consider the similarities between debit-card and checking transactions, as required by the statute; (2) (similar to prior arguments) the Board relied on prohibited costs and failed to "define adequately key terms"; and (3) (again similar to prior arguments) the Board relied on hypothetical costs to set a universal cap rather than considering issuer- and transaction- specific costs.  *Id.* at 38-43.

7

Linney's Pizza thus contends that Regulation II must be vacated, with the Court's ruling stayed in the interim to avoid upending the system they challenge while a new rule is promulgated. *Id.* at 44-45.

Before addressing such substantive challenges, the Court must also consider broader influences on the interpretive process, namely proper deference to the Board and the relevance of the major questions doctrine. The Board contends that, even absent *Chevron*, the statute gives the Board broad and substantial discretion in establishing an interchange fee standard. [R. 46-2 at 19-22.] It also suggests that its "original and longstanding" interpretation of the statute is entitled to respect on account of its consistency and contemporaneous enactment. *Id.* at 38-39. On the other end of the spectrum, Linney's Pizza suggests the major questions doctrine is implicated by this case, thus requiring a clear statement by Congress before bestowing significant authority and vast powers on the agency. [R. 39-1 at 27-28.] It notes that debit-card transactions involve the transfer of over a trillion dollars every year, with billions of dollars trading hands as a result of the interchange fees. *Id.* Linney's Pizza therefore concludes that "the Board must show that Congress 'clearly' wanted to include the third category of costs upon which the Board based Regulation II's fee standard." *Id.*

## A

### 1

When the D.C. Circuit addressed the prior challenge to Regulation II it did so applying the framework established by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The "ancien régime" of *Chevron* "treated 'ambiguous' statutes as 'implicit' delegations of authority to agencies, which had final authority to 'fill any gap[s]' in the statute with 'reasonable' interpretations." *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th

Cir. 2025) (quoting *Chevron*, 47 U.S. at 843-44.)  In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled *Chevron*, explaining that a statutory ambiguity "is not a delegation to anybody," meaning that judges could not "defer" to an agency's interpretation whenever they faced an unclear statute.  *Loper Bright*, 603 U.S. at 400.  Instead, they must arrive at their own "independent judgment" about what the statute means.  *Id.* at 412.

The Board contends that, despite the fall of *Chevron*, it is still entitled to deference.  It emphasizes that *Loper Bright* only rejected the general presumption "that statutory ambiguity indicates a congressional intent to delegate interpretive authority to an agency" and did not eliminate deference more explicitly delegated.  [R. 46-2 at 19.]  In their view this is a statute that expresses an intent to "empower the agency to 'fill up the details' of [the] statutory scheme."  *Id.* (quoting *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 382 (3d Cir. 2024)).  After all, the relevant statute here provides that the Board "shall prescribe regulations…to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. §1693o-2(a)(3)(A).  And the Board "may prescribe regulations… regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection."  §1693o-2(a)(1).

In *Loper Bright* the Supreme Court identified several categories of cases that involve an agency being authorized to exercise a degree of discretion.  "For example, some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term."  *Loper Bright*, 603 U.S. at 394-95 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977) (emphasis deleted)).  "Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed. 253 (1825), or to regulate

subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' *Michigan v. EPA*, 576 U.S. 743, 752 (2015), such as 'appropriate' or 'reasonable.'"  *Loper Bright*, 603 U.S. at 395.  If the statute at issue is one of the aforementioned, a court fulfills its role by "recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority… and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.*

Yet Linney's Pizza contends this is not such a statute.  In their view, §1693o-2 includes "guardrails" that channel the Board's calculation of a reasonable interchange fee cap.  [R. 53 at 11.]  These include requiring the Board to "distinguish between" costs to be considered and costs not to be considered, to "consider the functional similarity between" debit card transactions and checking transactions, and other purported limitations on network fees and fraud adjustments. *Id.* at 11-12; *see also* §1693o-2(a)(4)-(5).  Thus, they essentially contend that the statute operates in a far more mechanical way than the Board's claim of discretion would suggest.

In a sense both are right.  The statute does include broad, discretionary language as the Board suggests.  And were the Court called on to decide a scenario involving the application of discretion—such as whether a twenty cent or a nineteen-cent interchange fee cap is the right number (an admittedly extreme example)—the Board would be entitled to deference.  But Linney's Pizza makes a different sort of challenge which calls to mind the Supreme Court's admonition that a court fulfills its role in some cases by "recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority… and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries."  *Loper Bright*, 603 U.S. at 395.  Here Linney's Pizza's fundamental attacks are that §1693o-2(a)(4)(B) is binary and that Regulation II includes other costs explicitly prohibited by the statutory text.  While the distinction is a fine one,

when this Court is called upon to decide whether the Board strayed from the boundaries established by Congress it is entitled to no deference. *See Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 588 (6th Cir. 2025)("[W]e 'respect the delegation' by 'fixing the boundaries of the delegated authority' based on our independent view of the statute and 'ensuring that the agency acts within' those boundaries.")[2]  Instead the Court will determine the best reading of the guardrail provisions Linney's Pizza identifies and determine for itself whether the Board, via Regulation II, stayed within them.

### 2

While the Board seeks review of Regulation II under a deferential standard, Linney's Pizza's attempts to throw up an even higher hurdle for Regulation II—and thus the Board's interpretation of §1693o-2—by invoking the major questions doctrine.  In Linney's Pizza's view, this is a major questions case because debit card transactions involve billions of dollars every year, affect vast portions of the American economy, and "the Board's decision to include or exclude certain types of costs necessarily determines the transfer of *billions* of dollars from merchants and consumers to issuers."  [R. 39-1 at 27-28.]

"Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'— whether Congress in fact meant to confer the power the agency has asserted."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  In many cases "that context has no great effect on the appropriate analysis."

---

[2] In its Reply Brief the Board states that "Linney's Pizza does not appear to dispute that the Durbin Amendment delegates *some* authority; the only dispute is the breadth of this delegation."  [R. 55 at 7.]  It is worth noting that in *Pickens* the court described the dispute between the parties as a difference over "the scope of [the agency's] authority and whether the Secretary exercised it in a reasonable way," and it gave no deference when establishing the bounds of that authority.  *Pickens*, 1133 F.4th at 588.

*Id.* However, in some circumstances there are "'extraordinary cases' that call for a different approach—cases in which the "'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."[3] *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159-60). This is, in essence, the major questions doctrine.

Despite the billions of dollars implicated by debit card transactions and their associated fees, the Court is unconvinced that broad economic impact alone can countenance invocation of the major questions doctrine. Far from being an "unheralded" power discovered in a "long-extant statue," Regulation II came about as a direct implementation of the Durbin Amendment. It regulates in an area that the Board traditionally regulates and it specifically contemplates the Board making (at least some) decisions about the proper interchange fee cap. And, as the Board points out, Linney's Pizza's argument is fundamentally that the Board "*did not sufficiently* 'restructure' the debit card payment processing market, and seeks to *compel* the Board to take action with a greater economic impact." [R. 46-2 at 40.] If Linney's Pizza got its way, the interchange fee cap would be regulated down to a lower number that deviates even further from the market rates pre-Durbin Amendment. The major questions doctrine thus seems to be inapplicable in this case. Regulation II will therefore not rise and fall on the presence or absence

---

[3] As examples of regulations of sweeping breadth, the Supreme Court cited: *Brown & Williamson*, wherein the Court rejected the FDA's attempt to regulate or even ban tobacco predicts based on its authority over "drugs" and "devices"; *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021), wherein the Court rejected the CDC's attempt to institute a nationwide eviction moratorium under its authority to "adopt measures 'necessary to prevent the ... spread of' disease"; and several others. *See generally Gonzales v. Oregon,* 546 U.S. 243 (2006); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,* 595 U.S. 109 (2022). In *West Virginia v. EPA* itself the Court rejected an attempt by the EPA to "substantially restructure the American energy market" by "discover[ing] in a long-extant statute an unheralded power" which represented a "transformative expansion in [its] regulatory authority." *West Virginia v. EPA*, 597 U.S. at 724 (quoting *Utility Air*, 573 U.S. at 324).

of a clear statement from Congress permitting the Board to consider a third category of costs. Instead, other tools of statutory interpretation will answer that question.

### B

The Durbin Amendment states that the "amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction" and directs the Board to "establish standards for assessing whether the amount of any interchange transaction fee …. is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(2)-(3).  However, it also provides further clarification as to how the Board should arrive at that "reasonable and proportional" fee standard.  Relevant here is § 1693o-2(a)(4)(B), which directs the Board to "distinguish between" the  "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2)" and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)."  The parties fundamentally dispute the import of § 1693o-2(a)(4)(B).

In the Board's view, as implemented in Regulation II, this provision effectively creates three broad categories of costs: incremental ACS costs related to a particular debit card transaction, which *must* be considered; other costs incurred by issuers which are not specific to a particular debit card transaction, which *must not* be considered; and a third, silent category of non-incremental-ACS costs which are still related to a particular debit card transaction, which *may or may not* be considered.  Regulation II, 76 Fed. Reg. at 43,426-27.  The Board then utilized that third category to include a number of other costs in the Final Rule: (1) fixed ACS

costs, (2) transaction-monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction.  *Id.* at 43,429-31.

In sharp contrast, Linney's Pizza rejects that reading.  In its view, the statute's command that the Board "distinguish between" the two enumerated categories bifurcates the entire world of costs into only two categories—the must-considers and the must-not-considers.  [R. 39-1 at 21-23.]  Linney's Pizza looks also to the inclusion of the word "other" before "costs" in (a)(4)(B)(ii) to support its view that the statute establishes only two categories, not three.  *Id.* at 23-24.  It then rounds out its argument by drawing attention to the Board's initial proposed rule (which adopted Linney's Pizza's view of the cost categories) and referencing the Durbin Amendment's overall purpose of reducing debit card fees—all topped off with bits of legislative history.  *Id.* at 24-29.

Untangling the statutory knot at the heart of this dispute is not easy given the statute's thorough ambiguity, but the Court will nevertheless endeavor to "determine the best reading of the statute and resolve the ambiguity."  *Loper Bright*, 603 U.S. at 400.  The Court begins "where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989).  In so doing, the Court will utilize traditional tools of statutory construction, starting with the plain meaning of the words and grammar Congress used to enact its command.  These tools reveal that while Congress was, regrettably, imperfect in drafting the statute at issue, the Board's reading has it best.

Consider first Linney's Pizza's core textualist arguments, relying primarily on the phrase "distinguish between" and the word "other" preceding "costs" in (a)(4)(B)(ii).  To "distinguish" means to "'separate into different categories' or to 'make a distinction.'" *NACS I*, 958 F. Supp.

2d at 100 & n.27.[4]  Linney's Pizza takes this definition to mean that, by marking out only two categories to distinguish between, the statute establishes only permissible and impermissible costs.  They combine this inferential leap with the interpretive canon "*expressio unius est exclusio alterius*" ("the expression of one thing implies the exclusion of others") to suggest that because the statute did not command the Board to "distinguish between" the third category and the listed ones, then the third category must be excluded.

The Court thinks Linney's Pizza overstates the strength of that reading.  It is certainly a plausible one, but no definition of "distinguish" inherently limits the distinguishing being done to only two entities.  Furthermore, the Court considers "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" in answering interpretive questions.  *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997).  True, Congress enumerated only two categories, but the very nature of those categories creates a gray area for the existence of a third.  The inclusion of those categories does not imply the exclusion of the third in context because the statute also requires that the fee standard promulgated by the Board be "reasonable and proportionate" to the costs incurred by issuers, a command that Linney's Pizza simply glosses over.  The distinguishing Congress required the Board to engage in merely staked out what Congress considered essential to include and essential to exclude – it did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee.  In practice Linney's Pizza's reading reduces the Board to a mere calculator, sifting costs into one bucket or the other.  The Court is hesitant to adopt such a limited, mechanical reading of an otherwise barebones statute which provides the Board with a broad mandate regarding fees.

---

[4] Quoting *Webster's New College Dictionary* 337 (3d ed.2008) (defining "distinguish" as "to recognize as being different or distinct; separate into different categories; perceive or indicate differences; discriminate"); and *Black's Law Dictionary* 542 (9th ed.2009) (defining "distinguish" as "to make a distinction").

15

Linney's Pizza's next argument, its reliance on "other"[5] before "costs" in (a)(4)(B)(ii), requires a foray into the grammatical thicket before it can be fully appreciated. At its roots, the dispute turns on whether "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" contains a restrictive clause or a descriptive clause. "As their labels suggest, descriptive clauses explain, while restrictive clauses define." *NACS II*, 746 F.3d at 485. If (a)(4)(B)(ii) is read restrictively, then the category at issue is "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." This presents a narrow view of the category identified and one that allows the Board to rely on an unenumerated third category. Alternatively, if read descriptively, then the clause effectively says, "other costs," with the subsequent language merely serving as an example of what Congress meant. This is a far broader version of the category set out in (a)(4)(B)(ii) and would occupy all costs other than those explicitly required to be included by (a)(4)(B)(i).

Typically, "writers distinguish between descriptive and restrictive clauses by setting the former but not the latter aside with commas and by introducing the former with 'which' and the latter with 'that.'" *NACS II*, 746 F.3d at 486. Confusingly, Congress here split the difference—using "which" yet failing to set aside the clause with commas. Linney's Pizza makes much of the lack of comma, emphasizing that "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). Maybe so, but "the meaning of a statute will typically heed the commands of its punctuation." *Id.* And here the Court agrees with the D.C. Circuit when it considered this question—"[e]ven if punctuation

---

[5] *See* Other, *New Oxford Am. Dictionary* (3d ed. 2010) ("Used to refer to a person or thing that is different or distinct from one already mentioned or known about"; "Those remaining in a group; those not already mentioned"); Other, *Concise Oxford English Dictionary* (12th ed. 2011) ("Used to refer to a person or thing that is different from one already mentioned or known").

is sometimes a minor element in interpreting the meaning of language, punctuation is often crucial." *NACS II*, 746 F.3d at 486.[6]

As the D.C. Circuit explained, "[w]idely-respected style guides expressly require that commas set off descriptive clauses, but refer to descriptive 'which' and restrictive 'that' as a style preference rather than an ironclad grammatical rule." *Id.* at 487. This cuts in favor of the Board's reading as it sides with the rule rather than the preference. Furthermore, as the D.C. Circuit pointed out, "elsewhere in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive 'which' and restrictive 'that.'" The D.C. Circuit highlighted section 920(b)(1)(A) as just such an example, noting that Congress' instruction to the Board to prevent networks and issuers from activating on a debit card only one network or "2 or more such networks which are owned, controlled, or otherwise operated by" the same company must be read restrictively (despite the usage of "which") because "a descriptive reading would prevent the activation of any networks at all, rendering debit cards useless chunks of plastic." *NACS II*, 746 F.3d at 487 (citing 15 U.S.C. § 1693o–2(b)(1)(A)(i)–(ii)); *Cf. Barnhart v. Thomas,* 540 U.S. 20, 24 (2003) (finding a restrictive clause in the statutory phrase "any other kind of substantial gainful work which exists in the national economy"). And in the Durbin Amendment itself "Congress set aside every clearly descriptive clause with commas." *NACS II*, 746 F.3d at 487; *see e.g.* 15 U.S.C. § 1693o–(2)(a)(4)(B)(ii) ("other costs incurred by an issuer which are not specific to a particular electronic debit transaction, *which* costs shall not be considered under paragraph (2)" (emphasis added)).

---

[6] The lowly comma does a great deal of heavy lifting in our language, which Linney's Pizza's argument fails to fully credit. With just the presence or absence of a small squiggle, phrases such as "Let's eat, Grandma" can take on vastly different meanings. *See generally*, LYNN TRUSS, EATS, SHOOTS & LEAVES: THE ZERO TOLERANCE APPROACH TO PUNCTUATION (2003).

The Board's reading is further supported by the canon against surplusage, which preferences an "interpretation [that] gives effect to every clause and word of a statute." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). As the Board points out, Linney's Pizza's reading essentially renders superfluous the phrase "which are not specific to a particular electronic debit transaction." Linney's Pizza resists, noting that "the canon against surplusage is 'not an absolute rule,'" as "Congress may use surplus language 'to remove doubt.'" *United States v. Knight*, 2023 WL 5338637, at *5 (6th Cir. Aug. 18, 2023) (quoting *Marx*, 568 U.S. at 385). True, but here Linney's Pizza's reading appears to create even further surplusage by rendering subparagraphs (a)(2) and (a)(3) almost unnecessary. If the statute were as restrictive and mechanical as Linney's Pizza suggests, then there would be no need to require the fee standard to be "reasonable and proportional." Instead, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i).

Put together, § 1693o-2 plainly allows the Board to consider other costs it is not mandated to consider, as long as they are not costs it is prohibited from considering. Section (a)(4)(B)(ii) contains a restrictive clause, thus "other costs" must be read narrowly in the restricted fashion Congress set forth rather than in the broad and bifurcating manner Linney's Pizza envisions. This leaves a gray area for the Board to operate within, pursuant to its mandate to develop a fee standard that is "reasonable and proportional" to "the cost incurred by the issuer with respect to the transaction." This reading of the statute gives full effect to all of its terms and further reflects that the Board's role in implementing it involves something more than mere calculation and cost-sorting drudgery.

## C

Because the Durbin Amendment permits the Board to allow issuers to recover some costs in addition to incremental ACS costs, the Court must turn to Linney's Pizza's arguments attacking the costs the Board chose to include. These included costs are: (1) fixed ACS costs, (2) transaction-monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction. Regulation II, 76 Fed. Reg. at 43,429-31. Linney's Pizza contends that each of these included costs are prohibited by the statute, and thus their inclusion is contrary to law. [R. 39-1 at 29-35.] They further suggest the Board's decision to include those costs was arbitrary and capricious because it failed to define key terms and engaged in inconsistent line-drawing. *Id.* at 41-43.

## 1

The first additional cost the Board included was fixed ACS costs, which are costs associated with "network connectivity; software, hardware, equipment, and associated labor." Regulation II, 76 Fed. Reg. at 43,404. Linney's Pizza naturally reiterates its argument that the statute provides for only two categories of costs, but also argues here that the inclusion of fixed ACS costs itself runs afoul of § 1693o-2(a)(4)(B)(ii). [R. 39-1 at 29-30.] Linney's Pizza further contends that the Board's decision making was arbitrary and capricious in this area, for two reasons: first, the Board failed to define what "incremental" costs are or otherwise specify what costs are incurred in connection with authorization, clearance, and settlement; and second, the Board included some fixed ACS costs while excluding other such costs that would seem to be allowable under the Board's own reasoning. *Id.* at 41-42.

The core of Linney's Pizza's argument is that "fixed' costs are inherently not "specific" to a "particular" debit card transaction.[7]  They suggest that treating fixed costs here as specific to particular transactions is similar to "a shoe store claim[ing] that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale," a "stretch" already panned by the D.C. Circuit. *NACS II*, 746 F.3d at 489.  The Board explains its inclusion of fixed costs by noting that "no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit transaction."  Regulation II, 76 Fed. Reg. at 43,427.  And it emphasizes that it excluded "[c]orporate overhead costs incurred by an issuer for its general business operations [that] are shared across all product lines of the issuer and are not specific to a particular electronic debit transaction," because while "these costs may in some way be related to debit card programs and transactions [they] are not specific to a particular electronic debit transaction within the meaning of the prohibition in section 920(a)(4)(B)(ii) and therefore may not be considered."[8]  *Id.*

Up to this point the Court has been using the term "fixed ACS" costs to keep its analysis consistent, as that is how Linney's Pizza has opted to describe this particular category it challenges.  However, it is important to note that Regulation II specifically does not draw a distinction between "fixed" and "variable" ACS costs, nor does the statute itself.  In fact, the Board explained in great detail how any such distinctions would be "artificial and unworkable." *NACS II*, 746 F.3d at 489-90.  The Board noted that categorizing costs as "fixed" or "variable" was dependent on a "variety of factors," such as the relevant time horizon and volume range.

---

[7] *See* Fixed Cost, *Black's Law Dictionary* (9th ed. 2009) ("A cost whose value does not fluctuate with changes in output or business activity; esp., overhead expenses such as rent, salaries, and depreciation.")
[8] Excluded costs include corporate overhead and general debit card program costs, such as card production and delivery costs.  Regulation II, 76 Fed. Reg. at 43,427.  It is also this line-drawing distinction that Linney's Pizza attacks as arbitrary and capricious, presumably because corporate overhead and card production are also "related to debit card programs and transactions."

Regulation II, 76 Fed. Reg. at 43,427. It further explained that the same costs may be fixed in one year but variable in the next, or may otherwise depend on what particular method particular issuers use to conduct their business. *Id.* (highlighting the effect of performing transaction processing in-house v. using a third-party processor). Indeed, such a categorization may even fluctuate based on how issuers structure their own internal accounting. *Id.* Thus, the Board opted to include both fixed and variable ACS costs, reasoning that "no electronic debit transaction can occur without incurring these costs, making them costs specific to each and every electronic debit transaction." *Id.*

The Court thinks this question is best answered by looking to the broader statutory context. As the Board noted, "an interpretation that Section 920(a)(4)(B) prohibits consideration of all costs that are not able to be specifically identified to a given transaction would appear to exclude almost all costs related to electronic debit transactions" as it would be "virtually impossible" to attribute most ACS costs to any particular transaction. *Id.* at 43,426. Instead, the Board looked to the mandate that any interchange fee cap be "reasonable and proportional" to an issuer's costs to "allow[] issuers to recover costs they must incur in order to effectuate particular electronic debit card transactions but preclude[e] them from recovering other costs too remote from the processing of actual transactions." *NACS II*, 746 F.3d at 490. Before the Durbin Amendment, issuers were using inflated debit card fees as a profit engine, unconnected from associated costs, which the Amendment aimed to correct. Regulation II accurately reflects the prohibition in (a)(4)(B)(ii) by preventing attenuated or unconnected costs from being recovered by issuers while still ensuring that the fee cap is "reasonable and proportional" to those costs they do incur as result of authorizing, clearing, and settling electronic debit transactions.[9]

---

[9] The Board's failure to define these terms was also not arbitrary and capricious. As the Board explained, in context "fixed" and "variable" costs are amorphous and highly fluid, changing from year-to-year and

**2**

The second additional category of costs the Board included were "transaction-monitoring costs." These are costs associated with transactions-monitoring systems, "such as neural networks and fraud-risk scoring systems," which "assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction before the issuer decides to approve or decline the transaction." Updated Rule, 80 Fed. Reg. at 48,685. Linney's Pizza now challenges the inclusion of these transaction-monitoring costs, arguing that the problem with allowing these costs to be included in the fee standard is that "the Durbin Amendment already accounts for fraud prevention elsewhere." [R. 39-1 at 30-32.]

The Durbin Amendment includes a provision dealing with adjustments to the interchange fee for fraud prevention costs. 15 U.S.C. §1693o-2(a)(5)(A). That provision provides that "[t]he Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2)" if "such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer" and "the issuer complies with the fraud-related standards established by the Board under subparagraph (B)." Linney's Pizza takes this to mean that including

---

issuer-to-issuer. The Board's reasoning was itself sound and broadly explained why it chose to include what it did. As to Linney's Pizza's assertion that the Board was inconsistent in what costs it included and what costs it did not, the Court disagrees. Virtually everyone considering the issue agrees the Board was at least correct in excluding "corporate overhead" and "general debit card program costs." *See generally NACS I*, 958 F.Supp.2d at 105 ("The Board, to its credit, still *did not* consider costs associated with corporate overhead (*e.g.,* executive compensation), establishing and maintaining an account relationship, debit card production and delivery, marketing, research and development, insufficient funds handling, network membership fees, reward programs, and customer support") (emphasis in original). Courts are "generally unwilling to review line-drawing performed by the [agency] unless a petitioner can demonstrate that lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem." *In re MCP No. 165*, 21 F.4th 357, 383 (6th Cir. 2021) (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)). Those carveouts are inapplicable here as the lines the Board drew appear eminently reasonable in the statutory context.

22

transaction-monitoring costs, which have a fraud prevention component, in the base fee standard was improper because any adjustment should have come afterwards upon the issuer's compliance with fraud-prevention standards promulgated by the Board.  [R. 39-1 at 31-32.]

Fundamentally, Linney's Pizza's argument fails to recognize that transaction-monitoring costs, though they also aid in fraud prevention, are "integral to an issuer's decision to authorize a specific transaction."  Updated Rule, 80 Fed. Reg. at 48,685.  And the Board is required to include authorization costs in the fee standard.  In response Linney's Pizza engages in linguistic gymnastics, reasoning that "the Board has never treated transaction *monitoring* to be the same as *authorization*."  [R. 53 at 22 (emphasis in original).]  Such wordplay is unavailing in light of the indispensable role transaction-monitoring plays in authorization, regardless of the Board's particular phrasing.  Indeed, the Updated Rule makes clear that numerous parts of the authorization process—including "ensuring that the transaction is not against an account that has been closed, checking to be sure the card has not been reported lost or stolen, checking that there is an adequate balance, and authenticating the cardholder"—all do double-duty in preventing fraud.  Linney's Pizza does not, and cannot, argue that such authorization costs are inappropriate to include in the base fee standard.

This conclusion is reinforced by the statutory text.  The provision providing for fraud adjustments, §1693o-2 (a)(5)(A), differs from (a)(4)(B) in several ways.  These differences indicate that these provisions refer to different – but occasionally overlapping – categories of costs.  Notably (a)(5)(A) is much broader, dropping "particular" and using the more general "in relation to."  It also uses the plural "transactions," further indicating that the fraud prevention costs it is concerned with are of a different kind than the costs (a)(4)(B) addresses.  "[W]here Congress includes particular language in one section of a statute but omits it in another section of

the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). As the Board's Updated Rule acknowledges, the fraud prevention adjustment considers an issuer's fraud prevention costs over a broad range of transactions that are not tied to any particular transaction. It should thus be read to encourage systemic reform effectuating "programmatic improvements to address fraud outside of the context of particular transactions," rather than to address costs that are part of the ACS process. *See* Updated Rule, 80 Fed. Reg. at 48,686. §1693o-2 (a)(5)(A) does nothing to prevent the Board from including transaction monitoring costs as part of the base fee standard, nor does it undermine Congress' statutory scheme set out in the Durbin Amendment.

### 3

The third category of included costs which Linney's Pizza now challenges are fraud losses. [R. 39-1 at 32-34.] Fraud losses "are those losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." Regulation II, 76 Fed. Reg. at 43,431. Linney's Pizza argues that such losses are not "costs," that fraud losses are "entirely anticipatory payments from the merchants to the issuers for a fraud event that might never occur," and that "including a fraud-loss adjustment in the interchange fee standard vitiates the Durbin Amendment's structure and statutory scheme." [R. 39-1 at 32-34.]

None of these attacks stand up to scrutiny. Linney's Pizza first turns to the dictionary. Cost means "[t]he amount paid or charged for something; price or expenditure." Cost, *Black's Law Dictionary* (9th ed. 2009). By contrast (or so Linney's Pizza suggests) loss is "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way." Loss, *Black's Law Dictionary* (9th ed. 2009). As the Board

points out, however, costs may also be defined as the "loss or penalty involved in gaining something." Cost, *The Merriam Webster Dictionary* (2009). And consider how implausible Linney's Pizza's argument would be in another scenario. Like the fraud losses here, purchasing lottery tickets involves uncertainty—the purchasers may win or, more likely, may not. In a sense the $2 paid for the ticket is a "loss," in that it is "an undesirable outcome of a risk." But it is also plainly a cost, in that it is "the amount paid…for something." This argument from Linney's Pizza is therefore unavailing.

Next Linney's Pizza suggests that fraud losses are not "specific to a particular transaction," a sharp contrast from the prior challenges to Regulation II. *See NACS II*, 746 F.3d at 491 ("The merchants nowhere challenge the Board's conclusion that fraud losses, which result from the settlement of particular fraudulent transactions, are specific to those transactions.") It argues that fraud losses are, at least in some cases, anticipatory payments "for losses that might be incurred or could be incurred." [R. 39-1 at 33.] The Court will address this argument in later detail in Section II.D, *infra*. Effectively it reiterates Linney's Pizza's argument that the Board erred by adopting a "one-size-fits-all cap" for the fee standard, rather than setting "an issuer-specific and transaction-specific fee standard." [R. 39-1 at 35-38.] For the reasons the Court lays out below, that argument is incorrect on its own and fares no better nested within the challenge here. *See infra* Section II.D.

Finally, Linney's Pizza suggests that including fraud losses here undermines the statutory scheme allowing for a fraud prevention adjustment later. *See* § 1693o-2 (a)(5)(A). Not so. § 1693o-2 (a)(4)(B) addresses costs incurred by issuers that are specific to particular transactions. § 1693o-2 (a)(5) addresses "costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer." These provisions simply deal with

different costs, with (a)(5) taking a broader view. *See infra*, Section II.C.2. Including fraud loss costs that issuers incur unrelated to fraud prevention does not undermine the scheme set out in subsection (a)(5), and Linney's Pizza's policy arguments to the contrary are not well taken. As the D.C. Circuit explained, the "adjustment" provided for by subsection (a)(5) "describe[s] a bonus over and above the "reasonable and proportional" interchange fee." *NACS II*, 746 F.3d at 491.

The Court will not upset the Board's determination that including some fraud loss costs in the fee standard ensures reasonability and proportionality. Regulation II carefully explains that the fraud losses include "losses for fraud that [issuers] cannot prevent and cannot charge back to the acquirer or recoup from the cardholder." 76 Fed. Reg. at 43,431. It goes on to clarify that, with regards to some types of fraud (such as counterfeit card fraud, lost and stolen card fraud, and card-not-present fraud) it is merchants who are best positioned to reduce fraud occurrences. *Id.* However, in some cases "[e]ven if the merchant takes all reasonable steps to verify the card user, however, the transaction may nonetheless be fraudulent." *Id.* Nothing in the statute prevents the Board from taking these concerns into account and including fraud losses in the base fee standard.

**4**

The last costs Linney's Pizza challenges the inclusion of are network processing fees. [R. 39-1 at 34-35.] A network processing fee is the fee that the networks charge banks to process a debit-card transaction. Proposed Rule, 75 Fed. Reg. at 81,735. Linney's Pizza first argues that the Durbin Amendment defines network fees as "any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee" and that "[a] 'network fee' cannot simultaneously be both *different from* an 'interchange

transaction fee' and *a component of* an 'interchange transaction fee.'" [R. 39-1 at 34-35 (citing 15 U.S.C. §1693o-2(c)(10)).] Linney's Pizza then argues that other provisions in the Durbin Amendment prevent network fees from being used to compensate issuers, and that a network process fee does not fall within the ambit of §1693o-2(a)(4)(B)(i). *Id.*

As the D.C. Circuit remarked with regards to similar arguments years ago, "[t]his is easy" and Linney's Pizza "should have left it out entirely." *NACS II*, 746 F.3d at 490-91. These fees are "both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement" and no transaction can be completed without them. Regulation II, 76 Fed. Reg. at 43,430. Issuers must participate in networks and must pay fees to do so. Linney's argument that "[a] 'network fee' cannot simultaneously be both different from an 'interchange transaction fee' and a component of an 'interchange transaction fee,'" also flies in the face of logic – components are often different than the thing they ultimately comprise.

Linney's Pizza's contention that §1693o-2(a)(8)(B)(i) prevents network fees from being used to compensate issuers is similarly unsuccessful. As the D.C. Circuit noted, "section 920(a)(8)(B) is designed to prevent issuers and networks from circumventing the Board's interchange fee rules, not to prevent issuers from recovering reasonable network processing fees through the interchange fee."[10] *NACS II*, 746 F.3d at 491. Effectively subsection (a)(8) address what fees networks may charge, not what interchange fees issuers can receive. Even the Durbin Amendment's definition of network fees, which specifically excludes interchange transaction fees, contemplates this distinction.

---

[10] As an example of circumvention or evasion, the Board describes "a situation where a network lowers network processing fees paid by issuers by 50 percent while raising similar fees charged to merchants or acquirers by the same amount." [R. 46-2 at 35 n. 5.]; *See* 12 C.F.R. Part 235, app. A § 235.6(a)(2)(i) (Commentary).

**D**

Pivoting away from costs, Linney's Pizza also challenges the Board's decision to "implement[] a one-size-fits-all approach for interchange fees." [R. 39-1 at 35-38.] The crux of Linney's Pizza's argument is that, in its view, the text of the Durbin Amendment compels the Board to implement an interchange fee that is both issuer-specific and transaction-specific. Linney's Pizza contends that the statute's usage of "the" in subsection (a)(2) in relation to "issuer" and "transaction" must be understood as a definite article. Linney's Pizza finds further support in this view by looking to subsection (a)(4)(B)(i) and its usage of "the" and "particular" in connection to issuers and transactions.

The Board's response has two prongs. [R. 46-2 at 35-38.] First, it understands the statute's usage of "the" as being used generically or universally, rather than as a definite article picking out issuers and transactions individually. Second, it contends that its reading is the only one that harmonizes the Durbin Amendment provisions involving "issuers" and "transaction" and allow those provisions to be read consistently. This prong relies on the Board's contention that calculating transaction-specific costs would be "virtually impossible," thus supporting a reading of the statute treating "transaction" as referring to representative transactions. From there, the Board reads the same provisions that similarly refer to "issuers" as therefore referring to representative issuers. The Board also points to the discretion it was given in determining a "reasonable and proportional" fee as allowing this reasonable line drawing to occur amidst a "fact-bound exercise."

This is admittedly a close call. In the Durbin Amendment, Congress provided that "[t]he amount of any interchange transaction fee that *an* issuer may receive or charge with respect to *an* electronic debit transaction shall be reasonable and proportional to *the* cost incurred by

28

*the* issuer with respect to *the* transaction." 15 U.S.C. §1693o-2(a)(2) (emphasis added). Congress further directed the Board to distinguish between "the incremental cost incurred by *an* issuer for the role of *the* issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction, which cost shall be considered under paragraph (2)" and "other costs incurred by *an* issuer which are not specific to a *particular* electronic debit transaction, which costs shall not be considered under paragraph (2)." 15 U.S.C. §1693o-2(a)(4)(B) (emphasis added).

Certainly "the" can serve as a "fixed, singular reference." *In re MCP No. 185*, 124 F.4th 993, 1010 (6th Cir. 2025). And "[t]he consistent use of the definite article…indicates…that there is generally only one" entity referred to. *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). However, "the" "can also refer 'to a term used generically or universally.'" *NLRB v. Noel Canning*, 573 U.S. 513, 527 (2014) (quoting 17 *Oxford English Dictionary* 879 (2d. ed. 1989)). "The" is "a function word ... indicat[ing] that a following noun or noun equivalent is definite *or has been previously specified by context*." Nielsen v. Preap, 586 U.S. 392, 408 (2019) (quoting *Merriam-Webster's Collegiate Dictionary* 1294 (11th ed. 2005)) (emphasis added).

Here the Board's textualist reading is essentially just as plausible as Linney's Pizza's proposed alternative. The statute does not use "the" as consistently as Linney's Pizza may wish and in context "the issuer" can be read as being previously specified by the statute's reference to "an issuer." *See* Regulation II, 76 Fed. Reg. at 43,422 ("Section 920(a)(2) refers to "an issuer" and "an electronic debit transaction;" in other words, to a representative issuer and transaction. Section 920(a)(2)'s subsequent use of "the issuer" and "the transaction" is reasonably read as a reference back to the original representative use of each term (i.e., an issuer receiving an

interchange fee and a transaction for which a fee is received).")  Grammar and usage therefore do not cleanly cut one way or the other.

It is the second prong of the Board's argument that carries the day.  As the Board noted in Regulation II, reading the statute to require a transaction-specific fee "would result in a statutory requirement that is virtually impossible to implement."  *Id.* at 43,422.  This is because interchange fees are "computed at the time of the transaction" and "an issuer's costs for a specific transaction cannot be ascertained at the time the issuer receives the interchange fee."  *Id.*  Furthermore, any such transaction-specific fee would "result in an exceedingly complex matrix of interchange fees" with different calculations required for "tens of billions of electronic debit transactions and a large and growing number of covered issuers."  *Id.*  In Regulation II itself the Board pointed out that while some commenters saw the language in subsection (a)(2) as requiring an issuer-specific fee, "[n]early all commenters appear to believe the language did not require computing the actual allowable cost of each specific transaction; none argued for such a calculation."  *Id.*  In other words, no one argued for a transaction-specific fee as Linney's Pizza now does.

Practical concerns generally "do not justify departing from the statute's clear text."  *Pereira v. Sessions*, 585 U.S. 198, 217 (2018).  Nevertheless, "[w]here the literal reading of a statutory term would 'compel an odd result,' [courts] must search for other evidence of congressional intent to lend the term its proper scope."  *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (quoting *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 509 (1989)).  And courts should not "impose nonsensical readings of a statute 'if alternative interpretations consistent with the legislative purpose are available.'"  *Milman v. Fieger & Fieger, P.C.*, 58

F.4th 860, 869 (6th Cir. 2023) (quoting *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 254 (6th Cir. 2020)).

Here Linney's Pizza advances a reading of the statue—one in which it requires transaction-specific fees—that is nigh impossible to accomplish.  The fees and associated costs for these transactions are calculated at a later point, with costs shifting based on a variety of factors, effectively making it impossible to calculate transaction-specific fees as Linney's Pizza would wish.  And were such a feat possible, it would be further stymied by the gargantuan volume of daily transactions for which individualized fees would need to be calculated. Transaction-specific fees are not what was contemplated by the statutory text as made clear by practical context. The purpose of the Durbin Amendment was to reduce debit card interchange fees while still ensuring those fees are reasonable and proportional to issuers' costs—the Board's reading accomplishes that goal.

Because the Durbin Amendment does not require transaction-specific fees to be set, the most consistent reading is that it also does not require issuer-specific fees either.  Subsection (a)(2) refers to "an issuer" and "an electronic debit transaction, but later refers to both the cost incurred by "the issuer" and the cost of "the transaction."  "The transaction" certainly refers back to the more general "*an* electronic debit transaction" and while Linney's Pizza's argument provides reasons why both "the issuer" and "the transaction" may be read in a specific fashion, it does nothing to suggest why "the transaction" should be read one way (in a generic sense) but "the issuer" should be read another way (in a specific sense).  *See Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983) (Rejecting as unreasonable "the contention that Congress intended [a] phrase . . . to mean one thing when applied to 'banks' and another thing as applied to 'common carriers,' where the phrase . . . modifies both words in the same clause."); *see also*

*Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning[.]")

**E**

Linney's Pizza's last challenge is its assertion that the Board failed to adequately consider the similarity between debit-card transactions and checking transactions as directed by the Durbin Amendment. *See* 15 U.S.C. §1693o-2(a)(4)(A). Linney's Pizza focuses primarily on the fact that checking transactions "are required within the Federal Reserve bank system to clear at par." *Id.* It contends that, by moving away from the lower rates in the Proposed Rule, the Board ignored similarities between debit cards and checking transactions and that such a failure was arbitrary and capricious. [R. 39-1 at 39-41.]

An agency rule is generally arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "When Congress orders a decisionmaker to 'consider' a list of factors, Congress is instructing that '[e]ach factor must be given genuine consideration and some weight' in the final determination." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 778 (5th Cir. 2024) (quoting *Pub. Serv. Co. of Ind., Inc. v. ICC*, 749 F.2d 753, 763 (D.C. Cir. 1984)).

Despite Linney's Pizza's contention, the Board here complied with §1693o-2(a)(4)(A) and adequately compared debit-card transactions to checking transactions. In its summary the Board carefully highlighted the similarities between electronic debit transactions and checking

transactions noting that "both types of transactions result in a debit to an asset account; both involve electronic processing and, increasingly, deposit; both involve processing fees paid by merchants to banks and other intermediaries; and both have similar settlement timeframes." Regulation II, 76 Fed. Reg. at 43,398. The Board then looked to the differences between the two types of transactions, explaining such considerations as: the fact that "payment authorization…is an integral part of electronic debit card transactions (but not check transactions), which guarantees that the transaction will not be returned for insufficient funds or certain other reasons;" that there are "processing and collection costs incurred by the issuer (analogous to the payor's bank) for electronic debit transactions but not for check;" and that there is "par clearance in the check system." *Id.* The Board then went into even more granular detail about the similarities and differences it identified. *Id.* at 43,399-401.

Unfortunately, the fact that Linney's Pizza disagrees with the Board's conclusions is not enough to suggest that the Board "entirely failed to consider an important aspect of the problem." For example, Linney's Pizza hammers the Board for including network processing fees "after observing that including such fees would be 'similar to traditional paper-check processing where the payee's bank (the corollary to the acquirer for the merchant) typically pays all of the processing costs, while the payor's bank (the corollary of the issuer in an electronic debit transaction) typically pays no processing fees,'" while also stating that "the Board also recognized that 'in electronic check collection systems, both the payee's bank and the payor's bank generally pay processing fees.'" [R. 39-1 at 41 (quoting Regulation II, 76 Fed. Reg. at 43,430.)] Linney's Pizza may take issue with the Board's conclusion, but Linney's Pizza's own briefing highlights the degree to which the Board did consider important similarities and differences.

The Court also notes that much of the Board's analysis of the similarities and differences between debit card transactions and checking transactions includes references to a number of benefits and assurances which debit cards include that traditional checking transactions do not. Regulation II, 76 Fed. Reg. at 43,399-400. For example, "payment authorization is not an inherent part of the check collection process, and therefore the acceptance of a check by a merchant for payment does not include any automatic 'guarantee' that the check will be honored and the payment will be made." *Id.* Indeed, such guarantees must be purchased, with additional fees being paid by merchants for that service. *Id.*

Fundamentally, what Linney's Pizza fails to recognize is that the Board must balance competing considerations, beyond just making comparisons between debit card transactions and checking transactions. The statute also requires the Board to include and exclude certain costs. *See* §1693o-2(a)(4)(B). And it ultimately directs the Board to establish a "reasonable and proportional" fee for issuers to charge. *See* §1693o-2(a)(2). The very structure of the Durbin Amendment contemplates that debit card transactions will have at least some fees associated (i.e. will not clear at par) and the Board adequately considered the similarity between debit card transactions and checking transactions as one relevant factor in setting the interchange fee.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Linney's Pizza's Motion for Summary Judgment **[R. 39]** is **DENIED**;

2. The Board's Motion for Summary Judgment **[R. 46]** is **GRANTED**;

3. This matter will be **DISMISSED** and **STRICKEN** from the Court's active docket; and

4. An accompanying judgment shall be entered promptly.

34

This the 12th day of September, 2025.

Gregory F. Van Tatenhove
United States District Judge